STATE OF MISSISSIPPI *v.* JOSEPH REED.

RAILROADS.    *Station grounds.    Hackmen.*

> A railway company has no right to grant to one or more hackmen, excluding all others, the privilege of entering its station grounds to solicit patronage from incoming passengers.

FROM the circuit court of Warren county.

HON. W. K. McLAURIN, Judge.

The appellee, Reed, was prosecuted for the violation of § 1320, code of 1892, which makes it a misdemeanor for any person to go upon the inclosed lands of another without his consent, after having been notified by the owner, or his agent, not to do so.    The facts are stated in the opinion of the court.

*McWillie & Thompson,* for Alabama & Vicksburg Railway Company.

The question which appellee succeeded in inducing the court below to think involved in this case may be stated thus: Has a railway company the right to grant an exclusive privilege to one or more hackmen of entering its station grounds with hacks and soliciting patronage from incoming passengers, excluding all other hackmen from the grounds?    The question, however, cannot arise where, as in this case, the contract is made in aid

of the business of the railway company as a common carrier, although the hackman operating under it as the company's agent, derives incidental advantages. The case might be different had the contract no reference to the business of the railway company as a common carrier and if the privilege granted were merely a preference given to a particular hack line. Besides, the question ought not to be raised by way of an effort to engraft an exception, never in the contemplation of the legislature, upon a criminal statute. But, passing all this, and conceding for argument's sake that the question is before the court, did not the circuit court render an improper judgment on a conclusion of that question?

We wish to present two propositions at the outset: (1) The railway company is the private owner of its inclosed grounds, subject only to the rights which the law gives against it; (2) every right given by our constitution, by our statutes, and by the common law of the land against railroad companies, as concerns entering their premises at least, are given, not to the public generally, but to their patrons; and they are given against the roads in their public employment and capacity as common carriers, and not against them in any other relation.

The first of the above propositions, we believe, is recognized everywhere; the second one must be in this jurisdiction, in view of the provisions of our constitution and laws. Some of the states of this union, the decisions of whose courts are seemingly, but we think only seemingly, against us, have constitutional or statutory provisions giving rights generally against railroads and granting rights to the public generally. The English statute, 17 and 18 Vict., ch. 31, probably belongs to this class of legislation. We have, in our opinion, no such legislation in Mississippi. Unless appellee can point to some constitutional or statutory provision which authorized him to enter the depot grounds, he had no such right, and the judgment appealed from was and is erroneous upon the question propounded by appellee. By what process of reason-

ing can Reed be said to have been wronged?　What right had he to enter upon the premises of the railway company?　This is the fundamental, cardinal inquiry in this case.　He cannot have acquired it by prescription, nor by long permitted license so to do.　There is no pretense of a prescriptive right in the agreed facts.　Licenses to enter are revocable.　The public generally, including hackmen, have no right to enter railroad inclosures against the will of the owner.　In fact, by the very terms of § 3554, code of 1892, the railroad company is given affirmatively the right to exclude all persons except passengers. The depot ground at Vicksburg is the private property of the railway company, *subject only* to the rights of that portion of the public who are using, or are about to use, the railway as a common carrier.　It is not intimated in this record that Reed was using, or seeking to use, the railway as a common carrier; he was not a patron of the railway, nor was he seeking to become one.　Suppose one farmer is permitted to cultivate a part of the right of way of a railroad company, adjacent to his farm, are all farmers thereby privileged to do the same thing?　Certainly not.　The farmer who is allowed such a privilege does not derive the right or license from the company within, but without, the scope of the railroad's function as a common carrier.

Repeating that no right is given by law against the railroads of the state outside of their functions as common carriers, and that such rights as are given within such functions are given only to those who are using, or are about to use, the roads as common carriers—to patrons or those who seek to become patrons—we cannot recognize even the semblance of a right in Reed to complain of the railway company because he was excluded from its inclosed lands.　In this connection, we refer the court to the case of *Barker* v. *Midland Railway Co.*, 18 C. B., 46, s.c. 86 E. C. L., 45.　This case is determinative of the common law on the subject, and it has recently (1897) been approved in the house of lords.　*Perth General Station*

*Committee* v. *Ross*, App. Cases, s.c. 8 Am. & Eng. Ry. Cases (new series), 639. If a particular hackman who is excluded from a railway station premises has no right to enter the same, he is not given a right to do so because others are licensed to enter, unless he can point to a constitutional or statutory provision conferring such right. The common law gives nothing of the sort.

The railway company, subject only to the rights which the law gives its patrons (those dealing with it or who are about to deal with it in its character as a public carrier), can do with its property anything that any other proprietor of lands can lawfully do with his own. If, therefore, the rights denied railway companies to perfect dominion over their property—such as a private individual has over his own—be those given by law against them in their character as public or common carriers, and if these rights are so given only to those using, or being about to use, the roads as carriers, then Reed has no legal basis for complaint against the railway company because of his exclusion from the depot inclosure at Vicksburg. He was not a patron of the road, and he did not intend to become one. So far as this record shows, not one of the traveling public, to whom the law gives rights against common carriers, has ever complained, or ever will complain, because Reed is excluded from the depot grounds. We dare say no one of them will ever lift a finger by way of complaint, and we doubt not every one of them is ready to commend the order of exclusion, and that they regard it as delivering them from a first-class nuisance. When we come, as we presently will, to an examination of authorities, we will see the significance of distinguishing the passengers' rights (all of which are shown by the agreed facts to be carefully guarded and protected by the arrangement under consideration) from those, if they have any, of hackmen as such.

Recurring now to our second proposition, that every right given by our laws against railroad companies, as concerns en-

tering their premises, at least, are not given to the public generally, not to hackmen, but to the patrons of the road, and are given only against the roads in their public capacity as common carriers; and, having seen that Reed had no common law right to complain of his exclusion from the depot grounds, we submit that our constitution and statutes, unlike the laws of a number of other jurisdictions, make no provision which can reasonably be said to apply to the question under consideration. The constitution of 1890 gives affirmatively full power to the legislature to enact laws governing railroads and limiting their rights to make discriminating contracts, but we think the legislature of this state has not enacted any statute restricting, if reasonably construed, the power of railroads in any manner exonorating appellee from liability to punishment under the facts of this case. Section 4287 of the code of 1892 comes nearer having semblance of application to the case at bar than any other statute. In that section it is, among other things, provided that, "If any railroad shall, for its advantage, or for the advantage of a connecting line, or for that of any person, locality, or corporation, make any discrimination in transportation against any person, locality, or corporation, unless authorized by the commission, . . . it shall be guilty of extortion." This, especially when read with what precedes and follows it, clearly relates to overcharges. The word "extortion" implies as much, and the whole section manifestly relates to railroad transportation, and not to independent hack lines. It relates to railroads only as common carriers, and not to them in other relations or as doing other sorts of business.

*The Authorities.*—There are a number of cases in the books which seemingly support appellee's contention, but they do not really do so, if we understand them. *Cravan* v. *Rodgers*, 101 Mo., 247, rests upon a provision of the constitution of that state providing for a prohibition of "discrimination in charges or facilities in transportation . . . between transportation

companies and individuals, or in favor of either." We have no such provision in our laws. *Kalamazoo Hack Co.* v. *Sootsma*, 84 Mich., 194, s. c. Am. St. R., 699, rests upon the provisions of section 3355, Howell's statutes of that state, providing: "All railroad corporations shall grant equal facilities for the transportation of passengers and freights to all persons, corporations, or companies." We have no like statute to construe, affirmatively requiring a grant of equal facilities for transportation. *Montana Union Ry. Co.* v. *Manglois*, 9 Montana, 419. There are several points of difference which segregate the authority of this case from the question now before the court. But finally the Montana case turned upon a constitutional provision of the state, which the court decided gave the hackman the very right he insisted upon. *Marriott* v. *London, etc., Ry. Co.*, 87 E. C. L., 498 (decided 1857), is readily distinguishable, we think, from the case at bar. There the rights of passengers were involved. In truth, a passenger, who had been wronged and who expected frequently to be a passenger thereafter, was a party to the suit. The case, too, turned upon the English railway, etc., traffic act (17 & 18 Vict., ch. 31, sec. 2), and the rights adjudged against the railway were deduced from the act of parliament; besides, a careful reading of the case discloses that passengers from a particular place were greatly and generally discommoded by the course of conduct pursued by the railway; and, further, it was for want of a showing that the public was benefitted by such course of proceedure that the case passed against the railway. *Palmer* v. *London, etc., Ry. Co.*, 6 L. R. (C. P. Cases), 194 (decided 1871), and *Parkinson* v. *Western, etc., Ry. Co.*, same book, 554, are readily distinguishable from the case at bar. In the first one, during several hours of the day, an absolute monopoly was given to the vans of the company, and both of said cases rested upon the provisions of the second section of the railway, etc., traffic act (17 & 18 Vict., ch. 31), a statute which gave the right adjudged against the railway in each of the cases.

*McConnell* v. *Pedigo*, 72 Ky., 465, is the only case seemingly against us that we have not been able to trace to a statutory or constitutional provision. It is, however, distinguishable from the case at bar in several particulars. There was no pretense in that case that the excluded hackmen were noisy and worried passengers or interfered with the railroad's business, or that the exclusion was in order to accommodate passengers; there was in that case no element of continuous passage by the traveling public, and the railroad was not then engaged in the business of through carriage. In that case, too, the question of competition in charges between hackmen was a factor in the decision. The Kentucky case draws no distinction between the rights of passengers and the claims of hackmen; the passenger has rights, and they should be respected and enforced, when complained of by them, but a hackman, as such, has no rights, save in those jurisdictions where they are given him by statute, and has no standing in court to complain of other people's grievances. The Kentucky case, we respectfully submit, is ill considered and should not be followed.

We come now to cases in our favor, having already cited *Barker* v. *Mid. Cen. Ry. Co.*, 18 C. B., 46, s. c. 86 E. C. L., 45; *Perth General Station Committee* v. *Rose*, App. Cases, s. c., 8 Am. & Eng. Ry. Cases, new series, 639, and *Jenks* v. *Coleman*, 2 Sumner, 221. We now cite: *Beadell* v. *Eastern Counties Ry. Co.*, 89 E. C. L., 509; *Foulger* v. *Steadman*, 8 L. R. (Q. B. Cases), 65; *Barney* v. *Oyster Bay, etc., Ry. Co.*, 67 N. Y., 301; *Cole* v. *Rowen*, 88 Mich., 219; *Old Colony, etc., Co.* v. *Tripp*, 147 Mass., 35, s. c. 9 Am. St. Rep., 661; *Fluker* v. *Georgia, etc., Co.*, 81 Ga., 461; *Commonwealth* v. *Carey*, 147 Mass., 41; *Griswold* v. *Webb*, 16 R. I., 649; *Brown* v. *N. Y. Cen. & H. R. R. Co.*, 75 Hun., 355.

If the law ought to be different, it is for the legislature, and not the courts, to change it. In many states the legislature has made the change, but this has not been done in Mississippi.

*R. L. McLaurin,* for appellee.

The question presented in this case has been one of serious consideration by many of the supreme courts of other states, but we have not been able to find anything of the kind reported from this state. We cannot, however, in the light of our constitution, see how there can be much, if any, question in regard to it. The constitution of 1890, secs. 184, 186 and 190, expressly forbids any discrimination by railway corporations. The code of 1892, § 4287, forbids any discrimination, and places all such matters under the control of the Railroad Commission. No one doubts the right of the railroad company to treat all alike, and to keep all hackmen beyond certain bounds for its own and the convenience of the public, but this is a very different proposition from the one at bar. Here the effort was made to have the United States mail, baggage and other things carted to the postoffice and other places, where the railway company is under contract to take them, free of cost to the company, by giving one hack line and baggage man exclusive rights on the station's premises, in consideration of said hack line doing this hauling. It may be true that the railway company also desires to serve the public by preventing the crowding of hackmen on arrival of trains, but, if this is its motive, it must do it according to law and in such a way as not to discriminate. If it is lawful for the railway company to give this special privilege by contract, then it would be in its power to practically control the hack and transfer business of any city or town, which is beyond and in excess of its charter rights. There is, however, some authority for the position of the railway company to be found in the case of the *Old Colony Railroad Company* v. *Tripp,* 147 Mass., 35, 9 Am. St. R., 661, and 33 Am. & Eng. R. R. Cases, 448, and note. But in above cited case we submit that the dissenting opinion, concurred in by three of the judges, contains the better reasoning. On this side see also the case of *Fluker* v. *Georgia R. R. Co.,* 81 Ga., 461, and 12 Am. St. R.,

328, and cases cited, and notes to both cases in Am. St. R. On the other hand, numerous cases have held that the railroad company has no such authority, and the Massachusetts case above cited has been freely cited and criticized. See, especially, the case of *Montana Union Railway Company* v. *Langlois*, 9 Mont., 419, and 18 Am. St. R., 745, and notes; *Kalamazoo Hack & Bus Co.* v. *Sootsma*, 84 Mich., 194, and 22 Am. St. R., 693, and 10 L. R. A., 819; *Cravens* v. *Rogers*, 101 Mo., 247; *Cole* v. *Rowen*, 13 L. R. A., 848, and cases cited in notes; *Sansfort* v. *Catawoeissa, Williamsport & Erie R. R. Co.*, 24 Penn. St., 378, and 64 Am. Dec., 667; *McConnell* v. *Pedigo*, 50 Am. & Eng. R. R. Cases, 5; Elliott on Railroads, sec. 1678 and note.

WOODS, C. J., delivered the opinion of the court.

Joseph Reed, the appellee, was arrested upon affidavit charging him with trespassing upon private premises belonging to the Alabama & Vicksburg Railway Company, and was, before the justice of the peace, tried and convicted. He appealed from that conviction to the circuit court of Warren county, and was there tried upon an agreed statement of facts, and was, by the judgment of that court, acquitted of the charge and discharged. From this judgment of the circuit court the state prosecutes this appeal.

From the agreed statement of facts it appears that the depot of the railway company in the city of Vicksburg is surrounded by a fence, and that there is a "considerable inclosure of grounds adjacent thereto." It further appears, also, that "within said inclosure around the depot is the most convenient and best place for hackmen and busmen to discharge, solicit and receive passengers departing and arriving on the passenger trains of said company, and that any hackman or busman who had the exclusive privilege of entering this inclosure and soliciting passengers there, would have an advantage over hackmen or busmen excluded therefrom, so far as passengers arriving on said trains was concerned."

These facts, moreover, appear in the agreed statement, viz.: that the railway company granted, in June 1894, the exclusive privilege of entering said inclosure and soliciting passengers therein to said Peine, and that Peine was a person engaged in the hack, bus and general transfer business in Vicksburg, and that, after said exclusive grant to Peine, all other hackmen and busmen were excluded from entering said inclosure for the purpose of soliciting passengers therein, and were notified not to enter said inclosure for that purpose, under threat of being prosecuted as trespassers; that the appellee, Reed, after having been notified not to enter said inclosure for such purpose, drove his hack into the inclosure, and while therein solicited and received a passenger, and then drove away, and that in doing this he created no disturbance or disorder; that Cherry street is about 150 feet from the depot, and that from the depot to Cherry street, where hacks, other than Peine's, can stand, there is a good sidewalk. In a word, Peine's hacks have the exclusive privilege of entering the inclosure surrounding the depot and soliciting incoming passengers, while all other hacks are excluded from the inclosure and must stand outside and about 150 feet from the depot, and in an open street.

It is admitted in the agreed statement any hackman, or busman, having the exclusive privilege of entering said inclosure and soliciting passengers there, would, to that extent, have an advantage over hackmen or busmen excluded therefrom, so far as concerned incoming passengers.

The agreed statement of facts distinctly states the question to be decided by us, and to that we must confine ourselves. Says the agreed statement: "It is contended that the said company had the right to make the said contract, and thus exclude the defendant and others than the said Peine from the said inclosure, and to grant to the said Peine the exclusive right to enter the said inclosure for the purpose of there soliciting passengers for his hack line. Defendant controverts this

position, in so far as it is claimed that the said company can grant the exclusive right to any particular person to enter the said inclosure with his hack and there solicit passengers, and contends that the railway company must exclude all, or admit all into the said inclosure, so long as they conduct themselves in an orderly and peaceable manner.''

The single issue is thus sharply defined, viz.: Has a railway the right to confer upon one hackman the exclusive privilege of entering with his hacks its inclosed station-house grounds, and of soliciting incoming passengers, and to exclude all others from the inclosure, such privilege conferring advantages upon the favored hackman and discriminating against all other hackmen by forbidding them to enter the inclosure to solicit passengers, and by placing the hacks of those excluded one hundred and fifty feet from the depot, and in an open street? The question has never before been presented in our courts, but it is by no means a new one, and has been passed upon in other jurisdictions.

Quite independently of constitutional or statutory provisions, it seems to be the prevailing doctrine in the United States that a railroad company may make any necessary and reasonable rules for the government of persons using its depots and grounds; yet it cannot arbitrarily, for its own pleasure or profit, admit to its platforms, or depot grounds, one carrier of passengers or merchandise, and, at the same time, exclude all others.

The question is one that effects not only the excluded hackmen: it affects the interest of the public. The upholding of the grant of this exclusive privilege would prevent competition between rival carriers of passengers, create a monopoly in the privileged hackmen, and might produce inconvenience and loss to persons traveling over the railroad, or those having freights transported over it, in cases of exclusion of drays and wagons from its grounds other than those owned by the person having the exclusive right to enter the railroad's depot grounds. To

concede the right claimed by the railway in the present case would be, in effect, to confer upon the railway company the control of the transportation of passengers beyond its own lines, and, in the end, to create a monopoly of such business, not granted by its charter, and against the interests of the public. These are the views ably urged in *Kalamazoo Hack Company* v. *Sootsma*, 84 Mich., 194; *Montana Union Ry. Co.* v. *Manglois*, 9 Mont., 419; *Cravens et al.* v. *Rodgers*, 101 Mo., 247, and *McConnell* v. *Pedigo*, 92 Ky., 465. These are the views held, too, by the three dissenting judges in the case of *Old Colony Railroad Co.* v. *Tripp*, 147 Mass., 35–41. The majority of the judges in that case held that a railroad might grant to one an exclusive right to solicit the patronage of incoming passengers, but this is the only American case making that distinct holding, and that opinion was delivered by four judges, the other three members of the court vigorously dissenting, and with better show of reasoning, in our judgment. The cases of *Barney* v. *Oyster Bay & Huntington Steamboat Co.*, 67 N. Y., 31; *Fluker* v. *Georgia Railroad & Banking Co.*, 81 Ga., 461, and *Cole* v. *Rowen*, 88 Mich., 219, do not present the precise point involved in the case before us. They are all decisions of other questions and can be readily distinguished from the case in hand.·

Counsel for appellant think that in *Cole* v. *Rowen*, 88 Mich., 219, the supreme court of Michigan has swung away from the doctrine announced in the earlier case of *Kalamazoo Hack Co.* v. *Sootsma*, 84 Mich., 194. But that very able court did not so think, and was careful to disabuse the mind of counsel, who· seems to have the notion which counsel here puts forward, and the court clearly distinguished the two cases.

We are of opinion that the railway had no right to exclude Reed, the appellee, from its depot and inclosed grounds, on the facts appearing in the agreed statement on which the case is submitted to us, and hence that the action of the court below· in discharging Joseph Reed was correct.          *Affirmed.*.