Hillsborough, }
  June, 1899. }

### Hedding *v.* Gallagher & a.

A railroad company cannot confer upon one person the privilege of entering
upon its premises for the purpose of soliciting the carriage of the baggage
of passengers, to the exclusion of others engaged in the same business
and desiring to exercise the same right.

Bill in Equity, alleging that in May, 1898, a firm to which
the plaintiff is successor made a contract with the Boston &
Maine Railroad, whereby the firm was to furnish means to con-
vey the baggage and merchandise of passengers from the station
in Manchester, and whereby the railroad granted to the firm the
exclusive right to solicit the patronage of passengers upon the
railroad's grounds; that by the contract the firm agreed to fur-
nish suitable teams, etc., to so carry on the business as to fully
meet the convenience and necessities of passengers, and to
charge no more than reasonable rates, all of which the said firm
and the plaintiff as its successor have fully performed; that the
defendants, in violation of the plaintiff's rights, and after notice
from both the plaintiff and the railroad, persist in going upon
the premises of the railroad to solicit the carriage of baggage,
etc., and declare their intention to continue to do so. The
prayer of the bill is for an injunction to restrain the defendants
from interfering with the plaintiff's rights under the contract.
By an amendment, the plaintiff alleged that the object of the
railroad in making this contract was to provide for doing the
business in a constant and orderly manner, and to prevent un-
necessary crowding of its premises, annoyance to passengers,
and interference with the railroad employees in their work.
The defendants demurred.

*Oliver E. Branch*, for the plaintiff. Whether the contract by which the plaintiff was given the sole and exclusive right of soliciting the carrying of the baggage and merchandise of passengers arriving at the station in Manchester, and of standing his horses and teams upon the station grounds for that purpose, is a lawful contract, can only be determined by considering the nature of the property which the railroad has in its station, buildings, and grounds, the uses to which that property is devoted, the rights of the traveling public in that property, and the correlative duties of the railroad to the traveling public in respect to the same. Conceding for the moment that the contract creates a monopoly, yet that does not in and of itself imply that any legal right of the defendants has been invaded, nor does it of necessity call for the interference of the court to declare it void. It is still a question who may lawfully complain of such a contract, and ask the protection of the court from its consequences.

What is the nature of property held by a railroad company? When railroad property is acquired by condemnation, the title to it as against all the world except the original owner, in whom remains a contingent reversionary fee, is absolute, complete, and exclusive in the railroad company, and it holds it subject only to such use by the public as is naturally and necessarily incident to the business which the public have with the railroad, and which the railroad undertakes to perform. It is sometimes said that railroad property is " affected with a public use," but beyond the limits of that " public use" there is no common, general right in it of the public for any use, and the general public use of it is restricted to those things which are necessarily incident to the business which the railroad undertakes, and to which it invites the patronage of the public.

A railroad is a common carrier of persons and property. It must carry all persons who present themselves to be carried, who are in a proper condition, and who pay or offer to pay for their passage. It must transport all property offered for transportation, and afford to every one equal means and facilities for transporting the same. This is a duty which probably at common law devolves upon a common carrier, and in New Hampshire this common-law duty has been enforced by statute. P. S., c. 160, s. 1.

Incidentally to the duty which the railroad thus owes to the traveling public, it must furnish suitable station grounds for its trains, safe and convenient approaches to its trains, suitable waiting-rooms for the temporary accommodation of departing or arriving passengers, and suitable storage-rooms for baggage. All these things are incident to the public use of railroad property, because they are reasonably necessary, but they can be required of the railroad by those persons only who, from time to

time, are entitled to that public use. A mere trespasser upon the grounds of a railroad company cannot complain if he finds an unsuitable waiting-room, or the approaches to the station in a dangerous condition. The railroad owes him no duty as a ·common carrier. It is only such persons as have business with ·the railroad as a common carrier who may complain if the common carrier fails to discharge the duty which the law lays upon ·it of furnishing suitable means and facilities for transporting him ·or his property. *Morrissey* v. *Railroad*, 126 Mass. 376. In short, railroad property is " affected with a public use " for the benefit ·only of those who are entitled to enjoy that use, and the persons ·entitled to enjoy that use are those who have business to transact ·with the common carrier, which the common carrier undertakes to transact. Toward such persons there can be no discrimination in terms or facilities. *McDuffee* v. *Railroad*, 52 N. H. 430.

The contract is one which the railroad, by virtue of its own·ership in the station ground and buildings, had a right to make ; ·and was a proper exercise of the right to make reasonable and suitable regulations in regard to the transaction of business at the ·station. *Old Colony Railroad* v. *Tripp*, 147 Mass. 35; *Fitchburg Railroad* v. *Gage*, 1 Gray 291; *Spofford* v. *Railroad*, 123 Mass. ·326.

The case of *Markham* v. *Brown*, 8 N. H. 523, in which it was held that an innkeeper has no right to exclude from his inn a ·stage-driver who entered it to solicit guests to patronize his ·stage in opposition to a driver of a rival line who had been admitted for a like purpose, rests upon the right of the passengers rather than that of the driver, and distinguishes the rights of a guest at an inn from those of passengers in a railroad depot. The same question arose in the recently decided case of *Perth General Station Committee* v. *Ross*, Eng. Appeal Cases, 1897. Ross was a hotel-keeper in the vicinity of the railway station, and up to the time ·of the beginning of the action the appellants, who had a hotel of their own within the limits of the station, permitted all hotelkeepers, including the respondent, to have free access to the platform by themselves and their servants, for the purpose of accompanying their guests to the train by which they were departing, and of meeting them upon their arrival; but that privilege was qualified by the condition that no servant should on those occasions wear a distinctive badge or livery. Ross insisted on sending his runner to the station wearing the badge and uniform of his hotel, and the appellant sought an injunction restraining him from so doing, and waiting the arrival of passenger trains therein, for the purpose of obtaining customers for his hotel. The injunction was sustained. Lord *MacNaghten* said : " It seems to me that the question of law was decided, and decided rightly, forty years ago, by the court of common pleas in the

case of *Barker* v. *Midland Railway Co.*, 18 C. B. 46. In that case an omnibus proprietor claimed the right to enter a railway station with his omnibus, bringing passengers and goods for conveyance by the railway, or going to fetch railway passengers. The court unanimously gave judgment against the plaintiff. *Jervis*, C. J., said: 'The declaration proceeds upon the assumption that the station is the private property of the railway company, subject to the rights of the public using the railway. It is not contended that plaintiff was using or seeking to use the railway. What right, then, can he have to say to the company, 'I will use your private property for my profit'? There is no pretense for the action. It has neither principle nor any color of authority to sustain it.' *Creswell*, J., observes: 'The plaintiff had no intention to use the railway, and therefore he has experienced no obstruction which gives him any right of action. He merely desired that other persons should use the railway.' *Willes*, J., added: 'It is said that it is the duty of a carrier to allow persons who bring passengers, or goods to be carried, to enter his premises for the purpose of delivering there the passengers or the goods. It would certainly be somewhat extraordinary if any such right could exist in one to whom the company owes no direct duty, but who merely brings to the station individuals with whom the company contracts.' "

In *Commonwealth* v. *Power*, 48 Mass. 596, it was held that a railroad corporation has authority to make and carry into execution reasonable regulations for the conduct of all persons using the railroad or resorting to its depots, and that a superintendent has authority to exclude therefrom persons who persist in violating the reasonable regulations prescribed for their conduct, and thereby annoy passengers or interrupt the officers and servants of the corporation in the discharge of their duties. *Landrigan* v. *State*, 31 Ark. 50, and cases cited.

*Barney* v. *Steamboat Co.*, 67 N. Y. 301, was a case where an expressman sought passage upon the defendants' boat for the purpose, among other things, of taking, while on the boat, orders from the passengers for the delivery of baggage. The defendants had granted the privilege of transacting this business on the boat to another, and, as the plaintiffs continued it after having been warned to stop, the defendants caused him to be ejected from the boat and refused him passage. In an action to recover damages, it was held that the defendants' action was justifiable, and that they were not liable.

In *Fluker* v. *Railroad*, 81 Ga. 461, the plaintiff had for years, without objection, exercised the privilege of coming upon the right of way of the railroad and supplying passengers with lunches. Afterwards the defendant notified the plaintiff that the exclusive right of serving lunches had been leased to one Hart. Neverthe_

less, the plaintiff insisted upon continuing the business and was ejected. In an action against the company for damages for assault, the court granted a nonsuit. *Bleckley*, C. J., said: " It is contended that the company has no such exclusive dominion over the tracks and spaces embraced in its right of way as to entitle it to exclude therefrom any person entering thereon in an orderly manner and upon lawful business, and especially that it cannot discriminate against one person and in favor of another. We have discovered no authority for this position either in its more limited or more extended form. On the contrary, it would seem that the very nature of property involves a right to exclusive dominion over it in the owner. We cannot believe that there is a sort of right of common lodged in the public at large to enter upon lands on which railroads are located, and over which they have secured the right of way." *Barney* v. *Steamboat Co.*, 67 N. Y. 301 ; *Landrigan* v. *State*, 31 Ark. 50 ; *Hazen* v. *Railroad*, 2 Gray 577 ; *Junction R. R.* v. *Philadelphia*, 88 Pa. St. 424 ; *Sweeney* v. *Railroad*, 128 Mass. 5 ; *Pittsburg etc. R. R.* v. *Bingham*, 28 Ohio St. 364 ; *Keller* v. *Dillon*, 26 Ga. 701 ; *Harris* v. *Stevens*, 31 Vt. 79.

The decisions above quoted and cited clearly establish the principle that the persons to whom at common law, or by statute, a railroad company is bound to " furnish equal terms and facilities for transportation," are those who are asking for those equal terms and facilities, and not those who have no business with the company as a common carrier. It is bound to furnish a warm waiting-room in winter, but to whom ? Clearly to no one but passengers, or their friends who may come into the station for the purpose of attending them, or seeing them off. It is under no obligation to furnish a warm waiting-room for the general public. Suppose this plaintiff had insisted upon using the waiting-room in cold weather for no other purpose than to keep warm, would an action lie for his expulson after notice to leave ? Nor is the principle changed because the defendants claim to be common carriers. Their business is still a private business, and it gives them no right to condemn the property of the railroad for the purpose of prosecuting it, or to use the property of the railroad against its wishes for the same purpose.

Whatever rights the traveling public have to the use of the passenger station and grounds cannot be appropriated by the defendants; nor can the defendants say that, because the traveling public have a right to reasonable and equal terms and facilities for transportation at the station, they have a derivative right to furnish them those terms and facilities. When the railroad company enters into a contract to carry a passenger to the Manchester station, its contract of carriage ends when the passenger arrives at the station and has been furnished with a reasonably safe exit from the cars and station, a reasonably

comfortable and convenient place in which to wait temporarily before departing, and a reasonably convenient room for the temporary storage of his baggage. The railroad company is under no obligation to furnish him a hack to carry him to his destination, or a baggage wagon to transport his baggage. If it is under any such obligation, surely it then has the right of selecting and providing the hack or the baggageman; and if it provides suitable ones, and a sufficient number to accommodate the public, at reasonable rates, no one is discriminated against, and no one can complain. But if the passenger cannot demand that the railroad furnish him a hackman, or a truckman, for himself and his baggage, as we claim he cannot, then it follows that a license by the railroad company to any one of the exclusive privilege of supplying hacks and drays, for the use of arriving passengers, violates in no way the common-law rule, or the statutory duty of the railroad company to " furnish equal terms and facilities," since that duty ends when the passenger has been carried to the station and furnished a reasonably safe way of exit from the cars to his home.

The views expressed in *Markham* v. *Brown*, 8 N. H. 523, do not conflict with the principles contended for in the foregoing cases. The inn at Hanover was in the nature of a union station, from which lines of stages departed in various directions, so that guests of the inn, or persons resorting thither as to a railroad station for the purpose of taking passage, were entitled to reasonable facilities for securing their passage; and the proprietors of the stage lines might claim reasonable facilities for making connections with other lines. But it is to be observed that the court clearly distinguishes the inn from a place where the lines of stages " terminated," and where passengers were left to seek their own conveyances onward; and it predicates the right of stage-drivers to enter the inn upon the fact that the stages ran through the place in such a manner that travelers might reasonably expect conveyances onward would be tendered for their use. That is to say, the stage-driver entered the inn, not in the exercise of his own right, but in furtherance of the rights and privileges of the traveler. It will thus be seen that the analogies between the case at bar and the case of *Markham* v. *Brown* are quite distant. Indeed, the business of an innkeeper and that of a railroad bear little resemblance in principle. At most, it can only be said that both are engaged in a public employment, but here the likeness ends. A railroad acquires its property by condemnation; an innkeeper does not and cannot. A railroad must be run whether it pays or not; an innkeeper may close his house if he chooses to, and no one can compel him to open it. A railroad company must carry all persons who apply for passage, and if there is a lack of accommodations it must furnish

them or suffer the penalty of neglect; an innkeeper whose house is full may decline to take others applying for accommodations and be justified in so doing. For the time being, the inn is the home of the guest. His room is his own exclusively, and he may forbid the entrance of the landlord or his servants to it except for necessary purposes. A railway station is affected with no such exclusive interest on the part of the passenger. He cannot make it a temporary home, nor hold any exclusive control of it against the proprietors of the railroad or its servants. The guest of an innkeeper may for the time being use his room for the purpose of carrying on his business, or for the reception of his friends. A traveler upon a railway can make no such use of a railway station. A traveler arriving at his destination upon a railway ceases to be a traveler; and his contract of carriage ceases when he has been provided reasonable ways and means of egress to the streets. If it is said that the railroad company is under a legal duty to furnish him not only these, but the means for transporting himself and his baggage, then it follows that the railroad company has as much right to select and provide as exclusive a kind of conveyance for the passenger and his baggage at that point in the course of his journey home as it has at any intermediate point. So that, if it is justified in supplying a Pullman car or a Wagner sleeper for the use of the passenger at one stage of the traveler's journey, it may furnish an equally exclusive, if suitable, mode of conveyance for the traveler and his baggage at another stage of his journey.

In principle, however, the traveler is not in transit, in any legal sense, after his arrival at the railroad station. If he is, then it follows that, in case of accident to him between the station and his home, the railroad company might be liable. But if it be assumed that the traveler, on arriving at the station at Manchester, may demand something more than the means of safe egress to the street, and may require that facilities be furnished for transporting him and his baggage to his home or his hotel, nevertheless he cannot complain if, as in this case, adequate accommodations have been provided for all persons for the transportation of their baggage at reasonable rates. Railroad property is open to the use of the public who have business with the railroad as such. An inn is open to the use of the public who have business with the public, and who may therefore lawfully resort to the inn for the purpose of carrying on that business. The property of a railroad company is affected with a distinct public use; the property of an innkeeper is affected with a distinctly different kind of public use.

The objection that an exclusive contract to solicit the carrying of the baggage of passengers arriving at the station creates a monopoly, as before suggested, is immaterial. Before contracts

creating monopolies can be overthrown by the court, something further must appear than the mere fact that a monopoly is or may be created. For example, who would think of denying a landlord the exclusive right of licensing the sale of newspapers, or souvenirs, or any commodity, in the hotel office? His right to do so is incidental to the ownership of his property, so long as it does not interfere with the rights and privileges of his guests as such. Who could complain if he contracted with some person exclusively for the supply of his milk, his meat, or his vegetables? And could a rival producer of milk, meat, or vegetables insist upon his right to furnish the innkeeper at a lower rate, to the end that the charges to guests at the inn might be reduced? The word "monopoly" has no inherent terrors. Almost every man has a monopoly of his own property and its uses. If I choose to let to my neighbor the exclusive right of taking water from my spring, or oil or coal or minerals from my ground, for sale, no other neighbor of mine can interdict that right because I have chosen to confer a monopoly on some one else. Nor is the rule different in the case of public monopolies. Before the court can interfere to destroy a so-called monopoly, it must appear that it is demanded upon some substantial grounds of public policy. For example, contracts between railroad companies by which competition has been destroyed and an arbitrary monopoly created, will not be declared void by the courts, unless it appears that the destruction of competition has resulted in the imposition of excessive or unreasonable rates. Such contracts are contrary to public policy when, and because, they are directly injurious to the interests of the public. And it is upon that ground, and that ground only, that monopolies are said to be odious. A monopoly is not odious in any legal sense *per se*. It is so only when it is clearly prejudicial to the public. This precise question was settled in this state in *Railroad* v. *Railroad,* 66 N. H. 100, 128. If, then, the right of the railroad company to enter into a contract with the plaintiff was not incidental to ownership of its property, it is nevertheless valid and must be upheld, notwithstanding it confers a right analogous to a monopoly upon the plaintiff, so long as it is admitted that in carrying on the monopoly the plaintiff is furnishing the public full, adequate, and constant accommodations at reasonable rates.

I therefore submit that the principle underlying the decisions in several states in the West and South, in which no attempt has been made to analyze the nature of the contracts in question, but where the courts broadly and unqualifiedly assume that any contract creating a monopoly is void upon grounds of public policy, regardless of its actual operation or effect, can have no especial weight or authority in this jurisdiction; and that this

court will not hesitate to sustain the validity of any contract which creates a monopoly, however complete and absolute, if it does not in fact operate injuriously upon the public, thereby rendering it objectionable upon grounds of public policy. It is submitted that the right of a railroad company to create. a monopoly in the business of carrying passengers and their baggage from its stations is a right which springs out of its ownership of its property, and cannot be abridged because the same property is subject indifferently to the uses of the public for particular purposes. It is further submitted that the defendants have no other or different right to the use of the railroad property than the public at large,—that they possess no derivative, vicarious rights from. the traveling public which are superadded to their own private rights, and which therefore enable them to subject the property of the railroad to the uses of their private business. It is further submitted that in any aspect of the case, inasmuch as it appears from the facts admitted in the demurrer that the contract of the plaintiff with the railroad company was entered into for the purpose of securing the prompt, orderly, regular, and systematic conduct of the business of handling baggage, and preventing the unnecessary crowding of the platform and station and interference with the passengers and employees, it must be upheld as a reasonable and proper regulation of a railroad company's business, and upon that ground, if no other, should be sustained.

The cases cited by the defendants' counsel involving the rights of express companies, including *McDuffee* v. *Railroad,* 52 N. H. 430, have no application, for the reason that express companies, like all individuals or corporations, have a right to the transportation of their property over railroads, and railroads cannot discriminate against them in favor of other persons or corporations asking for the same service. Nor is there any analogy between the rights and privileges of the public in the public streets, and the regulation of the enjoyment of those rights by city ordinance, and the rights of the public in the property of a railroad. A municipal corporation is an entirely different legal entity from a private or *quasi* public corporation. A municipal corporation is simply a political division of the state, and every citizen, as a legal owner, in common with every other, of its property, has an equal, common right of enjoyment and use of it. But the general public have no ownership in the property of a railroad. They have such rights only as are incident to that use of it which the legislature authorizes, and to which the railroad voluntarily subjects it. It owes no duty to any one who has not a right to that use ; and however worthy the defendants may be, and however much they may desire to compel the railroad gratuitously to furnish them accommodations for carry-

ing on their private business, they cannot establish a right to them upon the right of the general public to be furnished with "reasonable and equal terms, facilities, and accommodation in connection with the transportation of themselves or their property over its lines."

*Sullivan & Broderick*, for the defendants.

PEASLEE, J.　The demurrer raises the question of the extent of the right of one who has undertaken a public business to make contracts which tend to infringe public rights. Those who engage in such business thereby surrender certain rights which belong to private persons. The common carrier is not permitted to carry for A and refuse to carry for B under like circumstances. The innkeeper must, to the extent of his accommodations, entertain all who apply in a proper way. By virtue of their employment, they have impliedly agreed to do these things for all. Their services are public property. Hence it is that, when a question arises which involves their rights or liabilities as to matters touching their duty to the public, the ordinary standards of the rights of private individuals to use their own as they will, or to contract or refuse to contract at their pleasure, afford little or no aid.

If one has entered upon such public employment, he must treat alike all who seek to employ his public services. It is equally true that he must accord like treatment to all who, engaging in another and connecting branch of public service, offer their services to those of the public who are temporarily upon his premises. *Markham* v. *Brown*, 8 N. H. 523. In that case it was decided that an innkeeper, at a place from which travelers habitually continued their journeys, could not discriminate between rival stage-drivers as to the privilege of soliciting the patronage of his guests upon his premises. So here, the solicitation of the patronage of incoming passengers, for the continuation of their journeys, is a privilege to be equally enjoyed by all. The attempt to distinguish the cases upon the ground that travelers commonly journeyed from Hanover in public conveyances, while their baggage is usually carried from the Manchester station in some other way, is conclusively answered by the fact that the carriage of baggage by public conveyance is so extensive that the plaintiff agreed to pay one hundred dollars a year for the mere privilege of soliciting such business upon the railroad's premises.

It is also said that "a traveler arriving at his destination upon a railway ceases to be a traveler," and that for this reason *Markham* v. *Brown* does not apply; and, further, that a railway station is not a hotel, where the traveler may stop and claim

the rights of a guest. If both propositions were sound, his situation would be a perplexing one. He could not stop and consider himself a guest; and if he went on he would not be a traveler and could claim none of a traveler's rights. The traveler doubtless ceases to be a passenger upon the railroad when he leaves its premises; but how he can cease to travel before he reaches his destination beyond those premises is not readily perceived. And if he continues to rightfully travel, he would seem to be justified in claiming a traveler's rights. His rights at the station do not terminate the instant he alights from the train. He also has the right to a reasonable time and way to leave the station, and to reasonable facilities for the reception of his baggage by whoever is to transport it further. The carrier's duties relating to a passenger's baggage do not necessarily terminate at the same time with those as to his person.

The carriage of baggage is a part of transportation. It is to be expected that when travelers arrive at a railway station they will have more or less baggage to be carried from there. It is admitted that this is so far a part of the reasonable and customary mode of travel that a person who has a previous contract with the passenger has the right to come upon the station grounds to await the arrival of his patron. The case differs vitally from the so-called analogous ones of keepers of restaurants and vendors of papers. A previous contract by a hotel-keeper to serve dinner to an incoming passenger in the station waiting-room would not confer upon the hotel-keeper a right to set a dining-table there in anticipation of the arrival of his guest. Refreshment and entertainment are mere conveniences which the carrier may, if he chooses, provide for the passenger, but it is no part of his duty to do so. In the matter of the further transportation of baggage, he does owe a duty to the traveler. As there is this fundamental distinction between the cases, it is not necessary to consider the result of a decision of this case in an attempted application of it to cases to which the reasoning cannot apply.

The right to enter upon the carrier's premises under a previous contract with a passenger being admitted, the right of those who seek such contract to reasonable and equal facilities cannot be denied upon any satisfactory grounds. It is argued (as in *Old Colony Railroad* v. *Tripp*, 147 Mass. 35) that the defendants had no right to go upon the premises, and therefore they cannot complain because others are admitted while they are shut out. It is true that no one has the right to go upon the property of a railroad corporation merely because it is railroad property. But this rule applies only so far as the corporation uses its property for private purposes, or in a public use which does not require or allow the admission of the public thereto. When this limit

is passed, and the corporation puts its property to public uses and admits thereto a part of the public, by what rule of law is it allowed to admit one and exclude another? "Public agents, taking private property for the public use, are bound to treat all alike (that is, without unreasonable preference), so far as the property is used, or its use is rightfully demanded by the public, for whose use it was taken." *McDuffee* v. *Railroad,* 52 N. H. 430, 454. The carriage of baggage is a right of the public. The work to be done is a part of the reasonable and necessary conduct of the public business, of which the railroad was chartered to carry on another and connecting part. It cannot be changed to a private undertaking by any form of words used in making an illegal agreement, nor by assertions (contrary to the fact) that the journey ends when the traveler and his baggage are left at the station.

The duty to provide equal facilities does not end with the mere act of carriage. It extends to all things which are incident thereto and a substantial part thereof. The carriage of baggage from the station, being in the reasonable and frequently necessary furtherance of a journey partly performed upon the cars, comes within this rule. There seems to be no sound reason for a different rule as to carriers of baggage from a railway station from that which applies to carriers of passengers from an inn. *Markham* v. *Brown,* 8 N. H. 523. But it is said that this case does not apply, for the reason, in addition to those before alluded to, that a railroad may acquire its property by the exercise of the right of eminent domain, while an innkeeper has no such power. The grant of this extraordinary right cannot lessen the public obligations of the grantee. On the contrary, it has always been considered a cogent reason for holding the grantee to a strict performance of his public duty. The right can be conferred only upon those who perform such a duty. There is no substantial distinction between *Markham* v. *Brown* and this case. The question in each is, whether the work of a public carrier is so connected with a public right that those who have undertaken another public duty, intimately connected therewith, must treat all such carriers alike. A common carrier, who owes the duty to furnish to passengers for Manchester reasonable and equal facilities at the station there, is bound to accord equal facilities to all who come to that station for the purpose of carrying passengers or baggage beyond its line of road. The rights of the traveling public being involved, all that the road can do is to make reasonable regulations as to how these rights shall be furthered by baggage-carriers. It cannot discriminate between them.

The amendment to the bill alleges that the object of this agreement is to regulate the business so that it may be done in an orderly manner. If this is the object, it must be sought by reg-

ulation, and not by the arbitrary admission of one and exclusion of all others. Regulation is not discrimination; and a contract, which so far discriminates that the favored party pays a substantial sum for the privileges conferred, cannot be considered to be a regulation in any fair sense of that term. If the road had the right to make an exclusive contract, it is immaterial what its object was in so doing. If, as was said in *Old Colony Railroad* v. *Tripp*, 147 Mass. 35, the defendants had no rights in the premises, and the only rights involved were those of the road, there would be no occasion to inquire into the motives of the parties or the reasonableness of the contract. It would be entirely their private business. If it is the road's private business, it would seem to follow that an exclusive contract might be made whereby the road exacted such a sum from the privileged carrier that he in turn must exact unreasonable prices for his services to passengers. When this course of procedure has been carried far enough, it amounts to a denial of the right of the public to have baggage carried in a reasonable way; and, unless a public right is involved, there is no power to prevent it.

It is argued that the right to be preserved is that of the passenger, and that these defendants take nothing by virtue of it. Even if this should be conceded to be true, it would leave the plaintiff in no better position. He sets up an agreement which he says is a legal contract, and he asks a court of equity to protect him in the enjoyment of it. But if it appears that the agreement infringes a public right which the court is bound to preserve, it will not be recognized as a foundation upon which to base a decree. *Indianapolis etc. Co.* v. *Dohn*, 153 Ind. 10.

It is said that the right of railroads to make contracts regulating their respective charges has been recognized in this state (*M. & L. Railroad* v. *Railroad*, 66 N. H. 100), and that therefore this agreement is valid. But the contracts there referred to are those which directly concern the road's own business and that of its competitors. The reason for sanctioning such an agreement is that it protects stockholders from the suicidal policy of rate-cutting by rival lines. No such reason exists here, and no case has been cited wherein it has been held in this state that a public carrier may create and protect a monopoly which does not directly concern his own business interests. "There would seem to be great doubt whether, upon any fair construction of general or special statutes, a common carrier, incorporated in this country, could be held to have received from the legislature the power of making unreasonable discriminations and creating monopolies, unless such power were conferred in very explicit terms." *McDuffee* v. *Railroad*, 52 N. H. 430, 454, 455.

The contention that this was merely a letting of the use of a portion of the road's real estate is also without merit. The use

of the road's public rooms and platforms has been given over to public purposes. It is not the fact that the station is railroad property that gives value to the agreement here set up, but the fact that the traveling public there have need of the services of connecting carriers. And the public have the right to demand that this need shall be supplied, or, in any event, that the road shall not prevent or hinder such a result. The road cannot derive revenue from this situation by the admission of one such carrier and the exclusion of all others, under the guise that it is a mere letting of the use of its property, or the claim that neither the plaintiff nor defendants could go there as of right. The property consists of the use. The use, so far as travel and its incidents are concerned, had passed to the public, subject only to reasonable regulation. If regulations are needed, they may be made and enforced (*Markham* v. *Brown, supra*); but that is the extent of the right of the road to participate in the control of the business of connecting carriers, whose services it is the passengers' right to receive in a reasonable way.

The cases from other jurisdictions upholding agreements like the one under consideration are in conflict with *Markham* v. *Brown, supra*, and their reasoning is not satisfactory. The one most relied upon (*Old Colony Railroad* v. *Tripp*, 147 Mass. 35) was decided by a bare majority of the court; and its soundness has been denied, not only by three of the seven judges who sat in the case, but also in nearly every jurisdiction where it has since been considered. *Kalamazoo etc. Co.* v. *Sootsma*, 84 Mich. 194; *Montana etc. Co.* v. *Langlois*, 9 Mont. 419; *McConnell* v. *Pedigo*, 92 Ky. 465; *State* v. *Reed*, 76 Miss. 211; Fetter Car. Pass., s. 245; 33 Am. Law Rev. 453.

This conclusion renders it unnecessary to consider whether the statute (P. S., c. 160, s. 1) is anything more than a declaration of the common law upon this subject. *McDuffee* v. *Railroad, supra*.

*Demurrer sustained.*

All concurred.