THE PENNSYLVANIA COMPANY *et al.*

*v.*

THE CITY OF CHICAGO *et al.*

*Opinion filed October 16, 1899.*

, 1. STREETS AND ALLEYS—*city cannot grant exclusive use of street for private purposes.* A city has no power or authority to grant the exclusive use of its streets to any private person or for any private purposes, but must hold and control them exclusively for public use.

2. SAME—*city may establish hack stands in front of railroad depots.* Railroad depots in cities are in the nature of public buildings, and the city council may establish hack stands in front of them so long as access to or egress from the building is not prejudicially interfered with. (CARTWRIGHT, C. J., dissenting.)

3. SAME—*railroad company cannot grant special privileges in street beyond limits of its grounds.* A railroad company in control of depot grounds and buildings cannot grant special privileges in the street beyond the limits of its own land, whereby one person is given, to the exclusion of others, the right to carry passengers from its depot beyond its own lines.

4. INJUNCTION—*private owner cannot enjoin use of street given by municipal authorities.* The use of a street, with the consent or acquiescence of the municipal authorities, cannot be enjoined at the suit of an abutting owner, nor can he invoke the remedy of injunction for the protection of the public and under that guise seek to protect himself. (CARTWRIGHT, C. J., dissenting.)

5. SAME—*injunction will not lie where adequate remedy at law exists.* The remedy of one whose property is damaged by the establishment of a hack stand in front of it under the provisions of a municipal ordinance is by action at law for damages to be determined by the jury, without resort to the remedy by injunction. (CARTWRIGHT, C. J., dissenting.)

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

LOESCH BROS. & HOWELL, and J. J. BROOKS, for plaintiffs in error:

The municipality, in respect of its streets, is a trustee for the general public, and holds them for the use to which they are dedicated. The fundamental idea of a street is,

181—19

*Margin reference column:*

| | |
|---|---|
| 181 | 289 |
| 184 | 595 |
| 181 | 289 |
| 98a | 4187 |
| 98a | 1188 |
| 181 | 289 |
| 193 | 1566 |
| 99a | 1443 |
| 181 | 289 |
| 194 | 1539 |
| 100a | 65 |
| 181 | 289 |
| 199 | 4347 |
| 199 | 1348 |
| 181 | 289 |
| 203 | 1280 |
| 107a | 1125 |
| e107a | 1126 |
| 181 | 289 |
| 112a | 1344 |

not only that it is public, but that it is public in all its parts, for free and unobstructed passage thereon by all persons desiring to use it.    *Smith* v. *McDowell*, 148 Ill. 51.

While it is true that the public must submit to all reasonable inconveniences in the highways, yet the highways are created for the public and abutting owners, and they have an unquestionable right to require a reasonable use by all who are entitled to use them. *Lockwood* v. *Railroad Co.* 122 Mo. 86.

It matters not that a permanent structure for private enjoyment in a street or highway is confined to a part little used or not used at all.    It becomes a nuisance as an encroachment upon the public right.    *Laing* v. *Mayor*, 86 Ga. 756.

It is no answer to the charge of a nuisance, that even with the obstruction in the highway there is still room for two or more wagons to pass, or that the obstruction itself is not a fixture. If it be permanently or even habitually in the highway it is a nuisance. The highway may be a convenient place for the owner of carriages to keep them in, but the law, looking to the convenience of the greater number, prohibits any such use of public streets. *Cohen* v. *Mayor*, 113 N. Y. 532.

"Irreparable injury," as used in the law of injunctions, does not necessarily mean that the injury is beyond the possibility of compensation in damages, nor that it must be very great; and the fact that no actual damages can be proved, so that in an action at law the jury could award nominal damages only, often furnishes the best reason why a court of equity should interfere in a case where the nuisance is a continuous one.    *Newell* v. *Sass*, 142 Ill. 104.

Stedman & Soelke, Charles S. Thornton, Corporation Counsel, and J. R. Carrigan, for defendants in error:

The use of a street or highway with the consent or acquiescence of the municipal authorities cannot be en-

joined at the suit of an abutting owner. *Doane* v. *Railroad Co.* 165 Ill. 510; *Murphy* v. *Chicago,* 29 id. 279; *Patterson* v. *Railroad Co.* 75 id. 588; *Stetson* v *Railroad Co.* id. 74; *Railroad Co.* v. *McGinnis,* 79 id. 269; *Railroad Co.* v. *Schertz,* 84 id. 135; *Insurance Co.* v. *Hess,* 141 id. 35; *Corcoran* v. *Railroad Co.* 149 id. 291; *White* v. *Railroad Co.* 154 id. 620; *Railroad Co.* v. *Bachus,* 154 U. S. 421; *Truesdale* v. *Grape Sugar Co.* 101 Ill. 561; *Dunning* v. *Aurora,* 40 id. 480; *World's Columbian Exposition* v. *United States,* 56 Fed. Rep. 654; *White* v. *Railroad Co.* 154 Ill. 626; *Bliss* v. *Kennedy,* 43 id. 67; *County of Cook* v. *Railroad Co.* 119 id. 218; *Chicago* v. *Building Ass.* 102 id. 380; *Tibbetts* v. *Railway Co.* 54 Ill. App. 108; *Union Coal Co.* v. *LaSalle,* 136 Ill. 119; *Miller* v. *Webster,* 62 N. W. Rep. 648; *Clark* v. *Donaldson,* 104 Ill. 639; *Hesing* v. *Scott,* 107 id. 600.

The law above cited applies to a corporation as well as to a private individual. *Railroad Co.* v. *Railroad Co.* 66 Ill. App. 362.

Where the relief prayed for, if granted, would be of great injury to the defendants and not a corresponding benefit to the complainants, an injunction will be denied. *Pratt* v. *Railroad Co.* 35 N. Y. Supp. 557; *Gray* v. *Railroad Co.* 128 N.Y. 509; High on Injunctions, 596; *H. & H. Co.* v. *Pasdell,* 5 Del. Ch. 435; *Fernes* v. *Railroad Co.* 121 N.Y. 505; *Railroad Co.* v. *Adams,* 28 Fla. 656; *Ammernan* v. *Dean,* 132 N. Y. 355; *Inter-State Commerce Co.* v. *Railroad Co.* 64 Fed. Rep. 981; *Nason* v. *Sanburn,* 45 N. H. 171.

No railroad depot company can make arbitrary rules discriminating as to who may occupy stands as provided by such company, and as to who shall solicit passengers therefrom.  Ray on Passenger Carriers, secs. 113-115; *Railway Co.* v. *Langlois,* 8 L. R. A. 753, and note; *Markham* v. *Brown,* 8 N. H. 523; *Craven* v. *Rogers,* 42 Am. & Eng. Ry. Cas. 656; *Railroad Co.* v. *Tripp,* 142 Mass. 43; *Express Co.* v. *Railroad Co.* 57 Me. 188; *Kalamazoo H. & B. Co.* v. *Sootsma,* 84 Mich. 194; *Mariott* v. *Railroad Co.* 1 C. B. (N. S.) 499; *Camblos* v. *Railway Co.* 9 Phil. 411; *Summitt* v. *State,* 8 Lea, 413.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The Pittsburg, Ft. Wayne and Chicago Railway Company, one of the plaintiffs in error, is the owner, and the Pennsylvania Company, the other plaintiff in error, is the lessee, of the tract of land occupied by the Union Passenger Station in Chicago, bounded by Madison, Van-Buren and Canal streets and the Chicago river. Several railway companies use this station under an agreement which provides that the Pennsylvania Company shall have control of the station and property. It is alleged that passenger trains to the number of 233 arrive and depart from the station every twenty-four hours; that the average daily number of passengers arriving and departing is over 31,000; that the pieces of baggage received and delivered daily number over 2900, and the United States mail received and delivered averages 178 tons per day. The passenger station fronts on Canal street, and the entire length of the building on that street is 1070 feet, with thirty entrances in constant use in the transaction of business. There are five other stations at different places in Chicago. All tickets beyond the terminus at Chicago, and known as "through tickets," have attached thereto a coupon for conveyance through the city of Chicago from this station to the station of the connecting line of railway, and each railway company entering the station has a contract for the use of a line of coaches for the performance of this service called for by the coupon. All coaches and wagons leaving the railway station perform this service of carrying passengers and baggage, and stand in front of the station as long as necessary to receive passengers, baggage and mail.

On December 31, 1885, the city council of the city of Chicago passed an ordinance establishing stands, which was approved by the mayor, and which provided that "any duly licensed hackney coach, cab or other vehicle for the conveyance of passengers may stand, while wait-

ing for employment, at any of the following places and for the period of time hereinafter provided: Stand No. 1. —The north side of Washington street, between Clark and LaSalle streets.   Stand No. 2.—That portion of the west side of Clark street beginning fifty feet from the south-west corner of Randolph and Clark streets and running thence to Washington street.   Stand No. 3.—The east side of LaSalle street, between Washington and Randolph streets.   Stand No. 4.—The east side of Canal street, occupying one hundred and ten feet, between Adams and Madison streets, as the superintendent of police shall direct.   Stand No. 5.—All theatres and other places of public amusement fifteen minutes before the conclusion of the performance.   Stand No. 6.—At all railroad depots ten minutes previous to the arrival of all passenger trains.   Stand No. 7.—On all such street corners from ten P. M. until sunrise, as the superintendent of police shall designate.   Stand No. 8.—At such other places where the occupants of the premises in front of which it is desired to stand for employment shall give permission, in writing, to the owner or driver so to do, and it shall be approved in writing by the superintendent of police: *Provided*, it shall not be lawful to stand for employment in front of a hotel where such stand has been established on the opposite side of the street from such hotel."

On January 20, 1896, the city council passed another ordinance, as follows:   "That when, at or near any railway passenger depot in the city of Chicago, a place has been or shall be designated as a licensed carriage stand, it shall be lawful for the driver of the first double and first single vehicle in line to stand in front of such railroad depot and solicit business, provided such driver shall not, in so soliciting business, obstruct the sidewalk or stand thereon at a greater distance than two feet from the curb line."

Hack stands Nos. 1, 2 and 3 are in front of public property.   Hack stand No. 4 is in front of the railroad

station.    Plaintiffs in error allege in their bill that since the passage of the ordinance this stand in front of the station has had hacks, cabs and express wagons standing continuously, against the protest of the complainants, in front of the station for a distance of about three hundred feet from the south side of Madison street, and that they occupy this stand continuously from seven o'clock A. M. until ten o'clock P. M., and the drivers occupy a part of the sidewalk, soliciting passengers and baggage.    It is averred that fifteen hacks and coupés and six express wagons, and from eighteen to twenty men, are at this hack stand continuously during the hours named; that twenty-three to twenty-five horses are fed daily at the stand, and that the drivers of the first single and first double vehicles have stood in front of the main entrance of the passenger station soliciting business.

On February 24, 1896, the plaintiffs in error filed their bill alleging the foregoing facts, and charged that the space in front of the station is necessary for the transaction of the business to which the station is devoted; that said ordinances are illegal and void; that the interference, interruption and daily damage and inconvenience to complainants and occupants of the station constitute irreparable damage; that the hack stand prevents ingress and egress to and from their property, and that its establishment is a damage and interference with their private rights, and causes an unjust burden upon their property without compensation, and gives for a private use a portion of Canal street in front of their property which is held in trust by the city of Chicago solely for use as a public street.    The city of Chicago and John J. Badenoch, superintendent, were made defendants, and the bill prayed for an injunction restraining them from continuing the stand for hacks and express wagons, and from permitting the drivers of first single and first double vehicles to occupy the sidewalk in front of the station for the purpose of soliciting passengers.

On leave granted for that purpose, Thomas J. Doyle and Walter Owen, representing the hackmen occupying this stand, were admitted to the suit and filed answers denying that the ordinances are illegal; or that the hack stand prevents complainants from the use of, or ingress to and egress from, their property; or that the space in front of the station is necessary for the transaction of the business of the station, or that the portion occupied by the hack stand is necessary or important for such business; alleging that along the entire space occupied there is no public traffic which is interfered with or damaged by the hack stand, and that on the station grounds and premises of the complainants, and at the entrance to the power house, are stationed hacks and cabs belonging to another proprietor, which wait there for passengers by an arrangement with the complainants.

No answer was filed by the city of Chicago, but it appeared by its corporate counsel. Replications were filed to the answers of Doyle and Owen, and on the hearing, by agreement, the application for injunction was made a final hearing, and affidavits were filed in support of the bill and answers. On hearing the circuit court found that the ordinance passed by the city of Chicago on the twentieth day of January, 1896, and which went into force on the twenty-eighth day of January, 1896, entitled "An ordinance regulating the drivers of vehicles at railroad depots," was illegal, null and void, and the enforcement thereof should be restrained, as prayed in complainants' bill of complaint. The court further found that the ordinance passed by the common council of the city of Chicago on the thirty-first day of December, 1885, entitled "An ordinance establishing hack stands," published as section 1705 in the laws and ordinances of the city of Chicago published in 1890, is a valid ordinance so far as it establishes stand No. 4, upon the east side of Canal street, occupying one hundred and ten feet between Madison and Adams streets as the superintendent of police

shall direct, and that said ordinance is a reasonable and valid exercise of the powers conferred upon the common council of the city of Chicago to the extent of the frontage of one hundred and ten feet named in said ordinance.

The title of the streets is vested in the city, and it has the conservation, control, management and supervision of such trust property, and it is its duty to defend and protect the title to such trust estate. The city has no power or authority to grant the exclusive use of its streets to any private person or for any private purposes, but must hold and control the possession exclusively for public use, for purposes of travel and the like. (*Field* v. *Barling*, 149 Ill. 556; *Hibbard & Co.* v. *City of Chicago*, 173 id. 91; *Barrows* v. *City of Sycamore*, 150 id. 588; *Ligare* v. *City of Chicago*, 139 id. 46.) The rule is, that all public highways, from side to side and from end to end, are held for the use of the public, and no other safe rule can be adopted. It does not follow, however, that every obstruction of a street would constitute a purpresture or be illegal. Necessary and temporary obstructions of the streets for the purposes of or incident to their repair, and interruptions caused by the improvement of adjoining lots if not continued for an unreasonable time, are not such encroachments as would amount to a public nuisance. The construction of street railroads, the erection of telegraph and telephone poles and the running of stage lines are all increased burdens on the streets which may be authorized by the municipality. A stage line running along the street, or cabs to be used by persons desiring that method of locomotion, would have a right to stop and take up and discharge passengers and use the street for such public use, but mere inconvenience to the owner of property by reason of a hack hailed to stop in front of his premises a sufficient period of time for one to mount or alight, would not give such owner the right to resort to a court of equity and have an injunction. The use of the street or highway with the consent or acquiescence of the mu-

nicipal authorities cannot be enjoined at the suit of an abutting property owner. This court has frequently determined this question and held that where an additional use of the street has been granted by the city an injunction will not be granted to restrain such use, as the right to so occupy is a question between one so occupying and the municipality having the control of the streets and charged with the duty of keeping the same free from unlawful obstructions and protect the public. The remedy of an individual—the abutting owner—is in an action for damages for an injury resulting to his property by reason of what is claimed by him to be a use of the street inconsistent with his rights. He cannot, however, be permitted to invoke the remedy by injunction for the protection of the public, and under that guise seek to protect himself. *Murphy* v. *City of Chicago*, 29 Ill. 279; *Corcoran* v. *Chicago, Madison and Northern Railroad Co.* 149 id. 291; *Doane* v. *Lake Street Elevated Railroad Co.* 165 id. 510, and cases cited.

The depot of the complainants, extending over one thousand feet in length, is for the use of its passengers entering therein or departing therefrom over the different lines of railways which receive and discharge passengers therein. A railroad company, whilst in a certain sense a private corporation, is in many other respects a public corporation and amenable to public control, and different from a mere private corporation. Such a corporation is invested with extraordinary powers, under which it may condemn a right of way, and by the exercise of eminent domain take to its own use, on payment of damages (or, rather, of compensation,) found by a jury, the property of others against the will of the owners, and use and exercise control over it for its corporate purposes. Invested with such power it becomes more than a mere private corporation, and in consequence of its vested powers, in every character, it partakes of a public corporation, and is, and always must be, held amenable to public control.

One of the duties discharged by the various railroads entering this depot is the carriage of passengers. From the facts shown by this record, on an average over thirty-one thousand passengers are received and discharged daily at this depot. There are five other depots in the city of Chicago at which passengers arrive and depart. The transfer of passengers from one railroad depot to another, or their transfer to various places in the city which they may be desirous of reaching, renders means of transportation necessary by which passengers so arriving and desiring to depart may have access to the various railroad depots or to other places in the city to which access is desired, and this, in many cases, is most conveniently met on the part of the traveling public by the use of hacks, which, to be of advantage, must be so accessible that unnecessary waste of time and inconvenience in trying to find the same may not result.

Recognizing that the use of this depot for the purposes for which the land was acquired on which this building was erected, and the use of the same by the railroad companies having access thereto, cannot be prejudicially interfered with by any ordinance of the city to the damage of the complainants, the question as to public and private rights is presented. It does not appear that ingress to and egress from complainants' property is prevented in connection with the complainants' building. It does appear that those who control this depot (complainants herein) have permitted other persons to have a lease on certain ground belonging to and connected therewith, on which such persons may stand their cabs and carriages while awaiting passengers thus arriving at said depot.

Taking into consideration the character of buildings such as depots of the railroads in the city, and recognizing their right to exercise the power of eminent domain, it may well be held that such buildings are in the nature of public buildings. It never has been held that the city council may not establish hack stands in front of public

buildings in the city, and no public want of access to such a convenience as hack stands can be greater on the part of the traveling public at any other point than at the depots of the city. A hack stand cannot, of itself, interfere with passenger or freight traffic of a railroad unless it prevents access to or egress from its buildings. In *Doane* v. *Lake Street Elevated Railroad Co.* *supra*, it was held (p. 519): "The real ground upon which relief by injunction is denied in such cases is, that the use of a street, being within the purposes for which it is laid out, and therefore a proper use, the right to occupy is properly a question between the defendant and the municipality having the control of its streets and charged with the duty of keeping them free from unlawful obstructions, or between the defendant and the public generally, the individual being left to his action for damages for any injury resulting to his property."

It appears from the record that certain property owned by the complainants and adjacent to the depot was leased to one Leroy Eighme for use as a hack stand, and that the lessee, by using the property and excluding others therefrom, would have privileges of access to the depot and of carrying passengers which others would not have. While we recognize that the companies which control the depot grounds and buildings may make needful rules for their regulation, yet they cannot grant special privileges beyond the limits of their own land, and make a contract with one which gives him the right to carry passengers from their depot beyond their own lines and exclude others from such privilege of carriage. If such companies control the transportation of passengers and merchandise beyond their own lines, such power might be exercised solely for their own benefit and not for that of the public. They cannot make a rule under which certain persons are allowed to occupy the streets or control travel and exclude others therefrom, regardless of any wrongdoing or misconduct on the part of the

persons so excluded. An attempt to exercise a power of that character would be unreasonable and unauthorized under the law. *Montana Union Railway Co.* v. *Langlois,* 8 L. R. A. 752, and authorities cited; *Old Colony Railway Co.* v. *Tripp,* 142 Mass. 35; *Schmitt* v. *State,* 8 Lea, 13.

*Kalamazoo Hack and Bus Co.* v. *Sootsma,* 84 Mich. 194, was a case where a construction company operating a railroad had leased to the plaintiff a piece of land used for depot purposes in the city of Kalamazoo, to be used by it for carriage and hack stand purposes only. Notices of this lease were posted up, and the superintendent of the railroad company also notified others that the property was for the exclusive use of the lessee company. The defendant placed his hack on the ground, and on being notified to leave, refused to do so and remained there until an incoming train, when he procured a passenger and drove away with him, whereupon the hack company sued in trespass. The court say: "The granting of this exclusive privilege to occupy this favored spot of ground, and one theretofore used customarily by all hackmen and busmen, to the plaintiff, was a discrimination against the defendant as well as all other hackmen not in the employ or service of the plaintiff, thus giving to the plaintiff a monopoly of the railroad company's grounds for the standing of hacks and busses and the soliciting of passengers therefor, * * * and is contrary to the provision of the statute that 'all railroad corporations shall grant equal facilities for the transportation of passengers and freight to all persons, companies or corporations.'" The court further say: "This statute evidently does not relate entirely to the mere carriage on cars of the road. To be effective it must be construed to include also not only the receiving of such passengers and freight at its depots, but as well the receiving of them by other persons, companies or corporations at the point upon its road where the carriage ends. The access to its grounds must be free and equal to all,

whether it be to take passage or leave the trains.   No . railroad company, under this statute, would be permitted to give to one hack or bus company exclusive access to its depots in the carriage of passengers or freight to its trains.  Nor can it any more properly give such exclusive or better privilege to such company taking passengers or freight from its trains to be transported from them elsewhere.  But, independently of the statute, the plaintiff could not recover in this case.   A railroad company can make all needful reasonable rules and regulations concerning the use of its depots and grounds, and can exclude all persons therefrom who have no business with the railroad or passengers going to and coming from the trains or depots, and it probably can prohibit all persons from soliciting passengers there themselves upon its premises, but it cannot arbitrarily admit one common carrier of passengers or freight to its depot or grounds and exclude all others for no other reason than that it is for its own private profit or pleasure.  Such rules and regulations must touch and affect all alike.  It may determine the distance from its depot or track at which persons soliciting passengers may stand while on its grounds, but this determination must affect and apply to all.  To permit a railroad company, upon any charge except of wrong or misconduct on the part of the person excluded, to allow one hackman or line of hacks to occupy a place upon its grounds which is denied to another, or to set apart the most favorable ground, as in this case, to one company and to exclude the others therefrom, would be, in the language of Justice Field in *Railroad Co.* v. *Tripp*, 147 Mass. 43, 'to enable a railroad corporation largely to control the transportation of passengers and merchandise beyond its own line, and to establish a monopoly not granted by its charter, which might be solely for its own benefit and not for the benefit of the public.'"

*Montana Union Railway Co.* v. *Langlois*, 9 Mont. 419, was an action for an injunction brought by the railway com-

pany against the defendant, in which the bill, answer and stipulated facts showed that the railroad company had contracted with Lovell Bros., by which contract they were to carry the mail for the railway company from its station to the post-office, in consideration of which they were to have the exclusive use of certain grounds belonging to the complainant, which it had enclosed. The defendant had insisted in driving his wagons and busses onto said lands and leaving them standing on the ground, the exclusive use of which had been granted to said Lovell Bros. The court, on hearing, dissolved the temporary injunction granted, and based their reason for so doing on the ground that to permit the injunction to stand, restraining other cab drivers than Lovell Bros., to whom the exclusive use had been given, from using the depot grounds, would aid in causing a monopoly, destroy just competition and cause thereby a hardship not only on other cab drivers but on the general public. The court cite *Mariott* v. *London and Southwestern Railway Co.* 1 Com. B. (N. S.) 499, in which case the complainant alleged that he brought passengers to the defendant's railway station and the latter refused him access to the station grounds to deliver his passengers there, while at the same time this privilege was granted to other companies, and upon this showing the injunction was granted.

*McConnell* v. *Pedigo & Hays,* 92 Ky. 465, was a case in which a contract similar to that in the case last above cited had been entered into between the railroad company and McConnell, by which an exclusive privilege was sought to be given to him in consideration that he would carry the mails for the company. The injunction sought was denied. To the same effect is the recent case of *State* v. *Reed,* 76 Miss. 211.

The law furnished a full and complete remedy to the complainants for any injury to their property by the creation of a hack stand by the city. The complainants may for any injury sustained have a remedy at law separate

and distinct from the public interests, and have compensation granted for damages sustained, which can be determined and admeasured by a jury, without resort to the extraordinary remedy by injunction. (*Chicago and Western Indiana Railroad Co. v. Ayres*, 106 Ill. 511; *Rigney v. City of Chicago*, 102 id. 64; *Lake Erie and Western Railroad Co. v. Scott*, 132 id. 429; *Doane v. Lake Street Elevated Railroad Co. supra.*) These complainants cannot, in the interest of the public, resort to this remedy, and have shown no special or peculiar injury to their property entitling them to an injunction.

There was no error in the decree of the circuit court and its decree is affirmed.

*Decree affirmed.*

Mr. CHIEF JUSTICE CARTWRIGHT, dissenting:

The occupation of a street as a place for the owners of hacks, carriages and express wagons to keep them in the intervals when they are not employed in the carriage of persons or property and while waiting for such employment, is purely a private use. It is of the same nature as the occupation of premises for a livery stable or stable yard, and in *Rex v. Cross*, 3 Camp. 224, Lord Ellenborough characterized it as making a stable yard of the king's highway. In *Branahan v. Hotel Co.* 39 Ohio St. 333, it was said to be a mere private use, like booths or structures for the use of dealers; and the same doctrine was affirmed in *McCaffrey v. Smith*, 41 Hun, 117. This is not controverted by the counsel in this case nor in the foregoing opinion, but the propositions laid down in the opinion as rules of law which, as I understand, lead to the affirmance of the decree are these: First, all public highways, from side to side and from end to end, situated in the city of Chicago, are held by said city in trust for the use of the general public for the purposes of travel, subject only to such interruption as necessity, accident or the ordinary requirements of business may demand, and the city has no power to appropriate Canal

street to any other purpose than such public use as a street, or to surrender it to any individual or individuals for private uses; second, if any portion of a street so held in trust for the general public for public purposes lies in front of public property, the city may divert such portion from the purpose for which it was established to the private uses of individuals for a hack stand; third, a railroad company is a common carrier of passengers, may acquire property by the exercise of eminent domain and is amenable to public control, therefore its depot buildings are in the nature of public buildings, and a street in front of such buildings may be devoted to private use for a hack stand; fourth, if a railroad company has leased property owned by it and situated near its passenger depot to an owner of hacks for use in his business, then the city may grant the adjacent street to other owners of hacks and express wagons for their private use as a hack stand; fifth, violation of the trust upon which a street is held, by its diversion to the private interests of a hack stand, with the consent or acquiescence of the municipal authorities, cannot be enjoined at the suit of an abutting property owner; sixth, equity will not interfere in such a case, because the law furnishes a full and complete remedy to the abutting owner for an injury to his property by the use of the street as a hack stand, and such owner may have recourse to law and recover damages for the injury sustained.

A large part of the opinion is taken up with the proposition that a railroad company cannot grant the exclusive privilege of going upon its depot grounds to one hackman and exclude other carriers of passengers from like privileges. But that has nothing whatever to do with this controversy, either as matter of fact or question of law. The entrances and exits for passengers are near Adams street. The next street north is Monroe street, and the second street north is Madison street. It appears from the answers and proof that carriages be-

longing to Leroy Eighme are permitted to stand for the service of passengers at the power house next to Madison street, north of the passenger station, on the grounds of the railroad company, and his agents solicit passengers and call the carriages from the entrance by pressing an electric button. The evidence is that he was allowed this privilege and was required to keep neat and clean carriages, with drivers in uniform, and suitable and satisfactory horses for drawing the carriages, and to charge no more than the fare ordinance of the city of Chicago. There is no allegation in the answers, nor any testimony, that complainants attempted to give him any rights on the public street. No relief was asked by the defendants in respect to going upon the station grounds and occupying complainants' premises equally with him, and none could have been granted. So far as the equal rights of hackmen are concerned, the circuit court by its decree, which is affirmed, held the ordinance which permitted them to solicit passengers and ply their business in front of the passenger station to be void, and left the agents of Eighme to solicit passengers and call carriages at that place, while it sent the hackmen to the hack stand between Madison and Monroe streets, about a block distant. With that decree the hackmen were content and did not appeal or assign a cross-error. The authorities cited and quoted from in the opinion to the effect that a railroad company cannot give one hackman exclusive access to its station, and the observations touching public duties, public control and the granting of monopolies and special privileges, do not relate to any question in the case and cannot influence the decision.

As to the propositions of law pertinent to the case, the first, as stated above, is the law and is sustained by the unanimous opinions of all courts. The remaining propositions seem to me to be inconsistent with the first and to be destructive of public and private interests, and I feel compelled to record my dissent.

I cannot see how the public character or public own-
ership of adjoining property can in any way change the
legitimate uses of a public street.   I do not see how the
conclusion that a street may be diverted to private use
for a hack stand follows from the fact that the adjacent
property is owned by the public or is used for a State
house, court house, public school, public library, engine
house or other building that may be devoted to public
use.   If a street may be perverted from its general uses,
as such, because it adjoins public property and be devoted
to the private uses of hackmen, it may be occupied for
any other sort of business with the public.   (*Branahan* v.
*Hotel Co. supra.*)   There is no greater public want of ac-
cess to a hack stand than to stands or booths where ar-
ticles which the public is accustomed to use are sold,
and a city is neither bound nor authorized to furnish
premises for either kind of business.   In fact, a hack
stand does not supply any general public want, but is a
convenience to only a very small fraction even of the
traveling public.   It seems to me absurd to say that be-
cause property is owned by the State for a State house,
or the county for a court house, or by a school district
for a school house, that the city may obstruct the street
in front of it and turn it into a market place or a stable
yard.   So, too, the power of eminent domain may be in-
voked to acquire property for these public uses and for
parks and other public purposes as well as a railroad
station, but I cannot see how that has anything to do
with the legitimate uses of a street.

The undisputed facts in this case are, that under the
ordinance establishing this hack stand an average of fif-
teen hacks and coupés and an average of six express
wagons, with from eighteen to twenty men, occupy the
allotted space along the sidewalk in front of complain-
ants' property continuously from 7 A. M. to 10 P. M.; that
from twenty-three to twenty-five horses are fed there one
or more times daily, and that the standing of so many

horses, and the custom of feeding them there, create a great amount of dirt and filth. This constitutes as much a permanent obstruction as a fish stand, fruit stand, or any other business carried on at the same place would be. It is necessarily an obstruction and interference with the ingress and egress to and from complainants' property, and the fact that there may be enough room left to enable them to transact their business is no justification for it. The same thing might be said of residence property,—that the owner would have room enough left although a hack might stand in front of it continuously. If the owner did not keep a carriage and had no driveway from the lot to the street, it might be said that he had no need for the ingress and egress to and from his property to the street,—and that is the most that can be said here. The owner's right is that his easement shall not be interfered with unlawfully, and to say that an obstruction, such as a row of hacks and express wagons, does not obstruct is a mere solecism. Any permanent obstruction to travel, whether it be little or great, is an encroachment on the public right and constitutes a nuisance, and the city has no right to permit such an obstruction, so as to deprive the public and the adjacent property owners of the use of streets. *Smith* v. *McDowell,* 148 Ill. 51; *Field* v. *Barling,* 149 id. 556; *Barrows* v. *City of Sycamore,* 150 id. 588; *Hibbard* v. *City of Chicago,* 173 id. 91.

A city has no right to obstruct its streets so as to deprive property holders of free access to and from their lots, (*Stack* v. *City of East St. Louis,* 85 Ill. 377,) nor can it, by ordinance or otherwise, devote them to a private use. This was expressly held in *Field* v. *Barling, supra,* where the city of Chicago, by an ordinance, attempted to authorize the building of an overhead private passageway across an alley, not obstructing travel, for the benefit of a party in the transaction of his business, and this court said (p. 566): "The fee of the street passed to the city of Chicago, but the city held the fee in trust for the public,

and for no other purpose. While the city had ample power to control, regulate and improve the street in such manner as the demands of the public required, the law conferred no authority on the city to devote the alley to private uses."

In *Rex* v. *Russell*, 6 East, 427, the defendant was found guilty, upon an indictment for a nuisance, for wrongfully and unlawfully causing and permitting twenty wagons to stand or remain for a long time, viz., ten hours on each day, before his warehouse, situate in a public street and highway, called Southgate street, in London. The court said, in sustaining the conviction (p. 230): "It should be fully understood that the defendant could not legally carry on any part of his business in the public street to the annoyance of the public; that the primary object of the street was for the free passage of the public, and anything which impeded that free passage, without necessity, was a nuisance; that if the nature of the defendant's business was such as to require the loading and unloading of so many more of his wagons than could conveniently be contained within his own private premises, he must either enlarge his premises or remove his business to some more convenient spot; but the courts could not be parties to any compromise for his using the street as his own for any part of his business."

In *Rex* v. *Cross, supra,* the defendant was proprietor of a Greenwich stage coach, which came to London twice a day and stood for three-quarters of an hour in the street near Charing Cross station, waiting for passengers where stages were accustomed to stand. Lord Ellenborough, in sustaining a conviction, said: "Every unauthorized obstruction of a highway to the annoyance of the king's subjects is an indictable offense. Upon the evidence given, I think the defendant ought clearly to be found guilty. The king's highway is not to be used as a stable yard. It is immaterial how long the practice may have prevailed, for no length of time will legitimate a

nuisance.   A stage coach may set down or take up passengers in the street, this being necessary for public convenience; but it must be done in a reasonable time, and private premises must be procured for the coach to stop in during the interval between the end of one journey and the commencement of another.   No one can make a stable yard of the king's highway."

In *Cohen* v. *Mayor of New York*, 113 N. Y. 532, the city granted a license to a grocer permitting him to keep his delivery wagon standing in front of his store night and day.   It was held the wagon constituted a public nuisance, and that for damages resulting therefrom the city was liable.   Peckham, J., in delivering the opinion of the court, said: "It is no answer to the charge of a nuisance, that even with the obstruction in the highway there is still room for two or more wagons to pass, nor that the obstruction itself is not a fixture.   If it be permanently or even habitually in the highway it is a nuisance.   The highway may be a convenient place for the owner of carriages to keep them in, but the law, looking to the convenience of the greater number, prohibits any such use of the public streets.   Familiar as the law is on the subject, it is too frequently disregarded or lost sight of.   Permits are granted by common councils of cities, or by other bodies in which the power to grant them for such purposes is reposed, and they are granted for purposes in regard to which the body or board assuming to represent the city has no power whatever, and the permit confers no right upon the party who obtains it."

The city of Cincinnati, by ordinance, established a hack stand on the side of Central avenue, in that city, next to the property of the hotel company.   In *Branahan* v. *Hotel Co. supra*, the court sustained a perpetual injunction at the suit of such abutting owner, and said: "This ordinance granted a permanent use of the street for mere private uses.   As well might the city authorize permanent booths or structures for the use of dealers in the

various articles of trade. Having no rent to pay, the occupants could accommodate the public at better rates. The supervision and control of the public highways of a city is a public trust, and while additional uses may be imposed, not subversive of or impairing the original use, such as laying down gas and water mains, yet the rights of the public to use it as a street, and of the adjacent lot owner to enjoy it as the means of access to his property, cannot be materially impaired. The city has the right to regulate hackney coaches, and also the right to appropriate private property for the use of the corporation, but it has no power to appropriate the easement of an adjacent owner to a mere private use."

So in *McCaffrey* v. *Smith, supra,* the court enjoined the use of a street in the village of Saratoga, adjoining plaintiff's property, for a hack stand, under the assumed authority of a village ordinance, upon the ground that the village had no authority to pass such ordinance. The court, in holding this ordinance illegal, said: "The public interest in the highway is nothing but an easement, which gives to individuals the right to pass and re-pass on foot or with animals and conveyances, and, as an incident, they may do all acts necessary to keep the highway in proper repair for traveling purposes. Any use of the highway except for the purposes of traveling and the making of necessary repairs under the direction of proper authorities, constitutes a trespass against the adjoining property owner. * * * But the legislature had not the power, neither had the municipal authorities, against the adjoining owner, to confer upon any person the right to make use of the highway for any other purpose than to pass and re-pass, without the consent of the owner of the fee." See, also, 2 Dillon on Mun. Corp. sec. 660; *Commonwealth* v. *Passmore,* 1 S. & R. 217; *Laing* v. *Mayor,* 86 Ga. 756; *Lockwood* v. *Wabash Railroad Co.* 122 Mo. 86; Elliott on Roads and Streets, 478; *Rex* v. *Jones,* 3 Camp. 230.

These authorities establish that such a use as is here attempted to be made of Canal street is a perversion and violation of the trust on which the city holds the street, and I cannot agree to the holding that such use cannot be enjoined at the suit of complainants, as abutting owners. In the foregoing opinion such a holding is rested on the ground that there is a remedy at law, by an action for damages. In the first place, that question cannot be raised in the case. It was not raised in the circuit court by demurrer, answer, or in any other way. Cases already cited show that the subject is not foreign to equity jurisdiction, which has been freely exercised, and the question not having been raised below cannot be brought into the case here. (*Stout* v. *Cook*, 41 Ill. 447; *Dodge* v. *Wright*, 48 id. 382; *Hickey* v. *Forristal*, 49 id. 255; *Magee* v. *Magee*, 51 id. 500; *Gridley* v. *Watson*, 53 id. 186; *Knox County* v. *Davis*, 63 id. 405; *Ryan* v. *Duncan*, 88 id. 144; *Clemmer* v. *Drovers' Nat. Bank*, 157 id. 206.) If the proposition is considered, it is unsound and against the authorities. Mr. High, in his work on Injunctions, (3d ed. sec. 816,) says: "The remedy by injunction is the most efficient means of preventing obstructions to public highways, and where the facts are easy of ascertainment and the rights resulting therefrom are free from doubt, the relief will be granted at the suit of a citizen having an immediate and special interest in the matter, and the owner of a lot abutting upon a street sustains such a special injury, different from that sustained by the public, as to entitle him to maintain an action to restrain the unauthorized obstruction of the street in front of his premises." In 1 Am. & Eng. Ency. of Law, (2d ed.) 225, it is said: "The owner of property abutting on a public highway is entitled, as one of the primary incidents of his ownership, to the right of free ingress and egress. This right exists whether the abutter owns the fee to the center of the street, leaving the public with merely an easement of passage, or whether the title to the entire highway is vested in the latter.

The right is a species of private property, of which the owner may not be deprived without due compensation, and it is a right which he may have enforced by the writ of injunction." In Lewis on Eminent Domain it is said (sec. 114): "The abutting owner has a private right of access to his property over the street which is as inviolable as his property in the lot itself;" and (sec. 637) "the abutting owner may, in general, enjoin any use of the street which is foreign to its purposes as a public highway and is calculated to produce special damages to his property." To the same effect are Hilliard on Injunctions, 273, and Waterman's Eden on Injunctions, sec. 262, note. This court is firmly committed to the same doctrine. *Green v. Oakes,* 17 Ill. 249, was a bill in chancery to enjoin the obstruction of a public road. The answer alleged that the court had no jurisdiction and that complainant had adequate relief at law. This court said (p. 251): "Where the right is clear and appertains to the public, and an individual is directly and injuriously affected by the obstruction of the easement or the creation of the nuisance, they (courts of equity) will interfere, on the application of such individual, to prevent the threatened wrong or invasion of the common right. In such case equity can give complete remedy,—prevent irreparable mischief and that continuous and vexatious litigation that would arise out of resort to the remedies afforded by law,"—citing authorities. That case was referred to and endorsed in *Craig v. People,* 47 Ill. 487. In *Carter v. City of Chicago,* 57 Ill. 283, an abutting owner filed his bill to restrain an abuse of power by the city in establishing a roadway next to his lot line so as to deprive him of a sidewalk, and the jurisdiction of equity was sustained. Although that was a subject on which the city had unquestioned power to act, the action being unjust and oppressive, the lot owner was not left to his remedy at law, which would be inadequate. The court there quoted from *Smith v. Bangs,* 15 Ill. 399, as follows: "So a court of equity has

jurisdiction to interpose by injunction where public officers, under claim of right, are proceeding illegally to impair the rights or injure the property of individuals or corporations or where it is necessary to prevent a multiplicity of suits." In *Field* v. *Barling, supra,* upon a full discussion and citation of authorities, the right to an injunction was again sustained.

The cases cited in the opinion do not sustain its doctrine. In *Murphy* v. *City of Chicago,* 29 Ill. 279, Murphy sued the city in an action on the case for damages occasioned by the city allowing a railroad company's track to be laid in Water street and raising the grade of the street, and the court said: "It is the settled law of this court, as well as in most of the other States of this Union, that it is the legitimate use of a street or highway to allow a railroad track to be laid down in it, and for doing so the city is not liable for any damages which may accrue to individuals." In that case it was held that there was no remedy at law against the city, and there was no question about equity. In *Corcoran* v. *Chicago, Madison and Northern Railroad Co.* 149 Ill. 291, it was held that if the ordinance could be regarded as not attempting to exclude the general public from the use of Archer avenue, but subjecting it to an additional public use, the abutting owner would be remitted to his action at law to recover compensation for the consequential damages resulting to his property. That was not to be an action against the city, which was denied in *Murphy* v. *City of Chicago* and which no one supposes could be brought, but an action against the person or corporation occupying the street. It was a case of the lawful and legitimate use of the street within powers expressly conferred on the city. In *Doane* v. *Lake Street Elevated Railway Co.* 165 Ill. 510, the use of the street permitted was for an elevated railway for passenger travel, and the settled law of this State is that such a use is not unlawful. It was there held that such erection, which greatly accommo-

dated the public business, increasing the facilities and safety of transit, did not subject the street to a new servitude or unlawful use. Where such a use of a street as is entirely lawful is granted by the city, an injunction will not be allowed to the abutting property owner, although there may be damage to him, because the use is a proper one. The city having a right to grant such a use, the question whether it has been granted is between it and the one claiming as grantee. A grant to a street railroad is only adding an additional mode of conveyance, and as the abutting property owner holds his land subject to the exercise of that right, necessarily he can not enjoin its exercise. This is a different question, for the use of a street for a hack stand is a purely private use. The property owner is not bound to resort to his action at law, as the use granted is of a kind he is not required to submit to. In the case of an attempt to pervert a street to an improper use foreign to the uses of a street, an abutting owner has a right which is entitled to protection in equity.

Where there is a substantial legal right and a threatened wrong to which a party is not bound to submit, the amount of damages which will result from the illegal and wrongful act does not bar relief in equity. In *Field* v. *Barling, supra,* this question was disposed of, and it was said that irreparable injury does not mean that it must be very great, and the fact that no damage can be proved, so that in an action at law the jury could only award nominal damages, often affords the very best reason why a court of equity should interfere. The question is whether the private use is an encroachment on the street, and if there is a breach of the trust upon which the streets are held by the city, the abutting owner may have relief although the injury may be small.

These cases make it very clear that the remedy of complainants is in equity. If the use is unlawful and foreign to the purposes of a street, the abutting owner

may have an injunction, and if, as assumed in the opinion, the grant of such use is legitimate and within the power of the city, the remedy at law which is offered to the complainants cannot be against the city, but must be against the various hackmen who occupy the hack stand. Not only would the injury not be compensated for in the trifling damages which would be obtained in the numerous suits against each individual hack driver, where the cost and trouble would exceed the recovery if it should ever be collected, but a new action would have to be brought against every subsequent hackman who should place his hack there under color of the city ordinance. To remit an injured property owner to such interminable litigation and a multiplicity of suits for trifling damages in each particular instance would be a mockery of justice.