### City of Chicago et al. v. Rothschild & Company et al.

#### Gen. No. 12,176.

1. ELEVATED RAILROAD—*when maintenance of connection with
station illegal. Held,* under the facts of this case, that a connecting
structure between an elevated structure and a private store is
illegal.

2. NUISANCE—*power of city council to declare structure connecting with elevated station a. Held*, that notwithstanding a connection between an elevated station and a private store may have been erected pursuant to ordinance, yet the city council has power at any time to declare such connecting structure a nuisance, and to compel its removal.

3. FRANCHISE ORDINANCES—*how construed.* Ordinances which grant franchises or special privileges are construed most favorably to the grantor and no powers are presumed to have been conferred which are not set forth in clear and explicit terms. Neither presumption nor implication will be indulged in favor of the beneficiary.

Bill for injunction. Error to the Circuit Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding. Heard in this court at the October term, 1905. Reversed. Opinion filed December 13, 1906.

**Statement by the Court.** We shall confine our statement of the facts of this case within the limitations essential to a due understanding of the conclusions reached in our determination of the questions involved, circumscribed by these conclusions.

Defendants in error, Rothschild & Company, a corporation, engaged in conducting a department store at Van Buren and State streets, and Edward Morris, a taxpayer of Chicago, in behalf of himself and all other taxpayers, filed a bill in the Circuit Court against plaintiffs in error, the City of Chicago and certain of its executive officers, and all of the several elevated railroad companies using or interested in that portion of the elevated railroad structures encircling the central or downtown portion of the city of Chicago, generally known and designated as "the loop," seeking to enjoin any interference with that portion of a certain passageway or bridge, already constructed, connecting the second story of the building occupied by Rothschild & Company with the platform of the State street station of the elevated road in Van Buren street at that point, or interfering with its completion or maintenance after completion. The bill was projected and the injunction

sought to prevent the enforcement against Roths-
child & Company of an ordinance of the city passed
December 13, 1897, declaring this passageway and
bridge and like structures a nuisance, and ordering
their destruction and removal.

During the progress of the hearing The North-
western Elevated Railroad Company, an answering
defendant, filed its cross-bill as owner and operator of
"the loop," praying in its own behalf for affirma-
tive relief similar to that sought by the prayer of the
original bill.

All of the elevated railroads involved in this litiga-
tion were organized under an act of the state legis-
lature of March 1, 1872, as amended by the act of
June 2, 1891. These roads are all operating their
several lines and routes under various ordinances
passed by the City of Chicago, all of which are ad-
mittedly lawful and are in this proceeding unques-
tioned. Wherever controversy upon these ordinances
arises, it is of construction and interpretation. The
ordinance of December 13, 1897, declaring the main-
tenance of passageways and bridges from buildings to
platforms of elevated stations akin to the one the sub-
ject of this controversy nuisances, and ordering their
destruction and removal, it is contended is void and
of no effect as against the rights and interests of any
of the defendants in error.

That portion of "the loop" in Van Buren street
was constructed by the Union Elevated Railroad
Company under an ordinance of June 29, 1896, with
whom Rothschild & Company made a contract in vir-
tue of which and that ordinance the right to construct
and maintain the passageway and bridge in question
is grounded.

The Northwestern Elevated Railroad Company
owns and operates the "loop," which it acquired from
the Union Elevated Railroad Company, the grantee of
the Union Consolidated Elevated Railroad Com-

pany, the beneficiary named in the ordinance of June 29, 1896, under which this portion of the "loop" was built. All of the ordinances in relation to grants of franchises and rights to construct, maintain and operate the several elevated roads, it is admitted, were accepted by the several companies and the conditions providing for the giving and filing of bonds complied with. It follows that such ordinances are alike binding upon the city and the several companies and those lawfully claiming under them, and form the contract in force from which their respective rights, duties and obligations must be measured and within which they must be confined.

The City of Chicago in its answer, among other things, admits the construction of the stations at State and Van Buren streets and at various other points around the "loop," but avers that such stations have been located and built in the streets, and are on the same plane as the elevated tracks and platforms extending along the tracks, and of the same height above the tracks as the platforms of the cars; that they have stairs leading to and from such platforms to the street below. Deny that any of such stations have bridges extending from the platforms of such stations into the buildings adjacent to the platforms, or that stations have been established in buildings adjacent thereto and have been connected by passages or bridges, and deny that any of the roads maintained in any such adjacent buildings, offices, waiting rooms, or other conveniences, prior to the passage of the ordinance of December 13, 1897, declaring such structures a nuisance and ordering their removal, and deny that this ordinance in any way affected any of the rights conferred upon the several companies by existing ordinances, and that said ordinance of December 13, 1897, is a lawful exercise by the city of a charter right to prevent unlawful obstructions upon its streets, and to declare

them a nuisance and remove them. Deny that the ordinance authorizing constructions conferred any power or right to construct passageways or bridges connecting platforms with adjacent buildings, but aver that such right was limited to the street below. Deny that the contract of Rothschild & Company with the Union Elevated Railroad Company relates to the installing of a station in the Rothschild & Company building, but relates only to the construction and maintenance of a passageway between the station in Van Buren street and the Rothschild building. That the passageway and bridge were not built under a permit from the city building department, but under the injunction obtained in this case after the permit was revoked and after the adoption of the ordinance of December 13, 1897. Deny that any ticket office, waiting room or station is maintained upon the Rothschild premises by the railroad company, but aver that the passageway and bridge have been constructed and are maintained by Rothschild & Company solely for its private use and benefit, for the purpose of inducing people to visit their premises and make purchases of the goods there exposed for sale. That if the structure is permitted to remain, it will be a continuing nuisance.

The Northwestern Elevated Railroad Company, a defendant in error, more than any of the other defendant railroads affected by this litigation, during the progress of the trial of the case in the Circuit Court, after obtaining leave so to do, filed its cross-bill. It may have been prompted to take this precautionary step at this stage of the hearing because of the doubtfulness, as a matter of law, of the right of the mercantile corporation and the citizen taxpayer to invoke the relief prayed. It is somewhat important to search with care this cross-bill in determining the equities arising upon the facts there stated.

In the first place, this cross-complainant adopts and

makes part of its cross-bill the allegations of fact set forth in its answer and the allegations of the original bill of complaint admitted in said answer. We will advert to some statements in the answer as affecting its attitude and claimed rights as a cross-complainant. They attack the ordinance of December 13, 1897, as an infringement and impairment of their contract right under the ordinance of June 29, 1896, whereby, it is averred, they have been deprived of much profit which they would otherwise have received from the construction of bridges and passageways connecting their stations and platforms with adjacent buildings, and that some payments to the city provided to be made under this ordinance have thereby become forfeited and they excused from making. While admitting the contract between Rothschild & Company and the Union Elevated Railroad Company, they deny that the ticket office, waiting room and covered passageway would afford a necessary method of ingress and egress to and from the elevated platform and station of said railroad in said Van Buren street at or near State street, but they admit that it would so be to the Rothschild & Company building (R. p. 241). And further on (R. p. 243) deny that these additional accommodations away from the station and platform would afford a means of reaching the trains operated on said elevated structure superior to the ordinary stairways erected in the street for that purpose, or that the elevators in the Rothschild building would afford the public a means of ascent to the level of the elevated loop structure more convenient than the stairways erected upon the sidewalks and streets along said loop. Deny that stations, platforms or stairways encumber streets or sidewalks or obstruct light, air or travel along such streets. Also deny that the system of locating stations in buildings with elevators, ticket offices, waiting rooms and covered passageways is far superior

to any other means devisable for that purpose, or that said system requires smaller and less obstructing buildings and structures over said streets and sidewalks.

The cross-bill, after setting up title to the loop and its construction, avers that the Union Elevated Railroad Company, after the location of its State and Van Buren streets station, located a station under a power claimed to be given by the ordinance of June 29, 1896, in the Rothschild building, which was necessary to accommodate the public desiring to be transported over said railroad; that plans thereof were submitted to the commissioner of public works, and a permit issued for the construction of the passageway, etc. Answers of the other defendants and the bill and supplemental bill of complaint were by agreement ordered to stand as answers to said cross-bill.

The following part of section 4 of the ordinance of June 29, 1896, it is contended, contains the authority to construct and maintain the bridge and passageway in dispute.

"The permission and authority to locate, construct and maintain all such requisite platforms, landings and line of stairs leading to and from the sidewalk of the streets and avenues, and the said elevated stations being herein expressly granted said company whenever and wherever such methods of reaching said stations may be found necessary. *Nothing herein contained, however, shall prohibit said company from locating and maintaining its stations in buildings purchased, leased or erected on grounds purchased or acquired by condemnation or lease, or in buildings adjacent to said stations or platforms, where authority is given by owners or lessees of said buildings for above purposes wherein it may, for the convenience and comfort of its patrons, place its ticket offices, waiting rooms. sanitary accommodations stairways, elevators, and all requisite methods of ingress and egress, and the right to construct and maintain covered passageways or connections between*

*the interior of all such station buildings and the exterior platforms, is hereby expressly granted to said company."*

The contract of Rothschild & Company with the Union Elevated Railroad Company for the structure in dispute here is claimed to be ratified by and binding on the city in virtue of section 15 of the December ordinance, which, among other things, provides "that every and all acts or deeds of transfer of rights, privileges or franchises, and all contracts, mortgages, deeds of trust, leases, stipulations, licenses and undertakings made, entered into or given between said corporations, or between any two or more of them, or between any one or more of them and any other person or corporation, respecting or concerning their several railways or the construction thereof, or the use and operation of the same, are, and every such act, deed, contract, mortgage, lease, stipulation, license, or undertaking is, hereby approved, ratified and confirmed, and the same shall be deemed and held as valid and effectual to all intents and purposes as if made a part, and the same are hereby made a part of the said several ordinances."

The contract of Rothschild & Company with the Union Elevated Railroad Company for the construction of the bridge structure here involved has this provision: "The said first party further agrees that free access to and from said station to the said building by means of the said passageway so to be constructed shall be permitted during all hours of such day during which the said building so occupied by the said party of the second part (Rothschild & Company) shall be kept open for business." This contract further provides that Rothschild & Company shall during its tenancy of the building pay $1.50 per day as compensation of a ticket seller during the days the building shall be kept open for business, also to keep the passageway and the public sidewalk

underneath clean and unobstructed, and save the elevated company harmless from all damages arising from a failure so to do.

Among the facts stipulated upon the trial are the following (R. p. 320):

That none of the defendant railroad companies has now or ever had any right or interest in the store building occupied by Rothschild & Company or in any of the furnishings or personal property contained in said building, either in the so-called *"waiting room,"* referred to in the testimony, or elsewhere in said building, or any control of any portion of said building or personal property, and that none of said railroad companies pays or has ever paid or agreed to pay Rothschild & Company, or its predecessor, rent or other consideration for the use of any portion of said building for station purposes or otherwise, or of any property therein, unless such right or interest be conferred by contracts in evidence or the ordinances appearing in the bill.

That the ticket office, for which Rothschild & Company pays the ticket seller, is located on the station platform at the end of the passageway.

That since the passage of the ordinance of December 13, 1897, the city has granted the right to certain individuals and corporations to lay switch tracks from steam roads to their several places of business, and that such rights have been permitted to remain unchallenged. That elevated railroads tend to relieve congested condition of the streets. That the business places of other firms engaged in like business are connected on the "loop" by passageways and bridges with the platforms of the elevated road; that some of such firms built under protection of an injunction, and others, including the Lake Shore & Michigan Southern Railroad Company, without any litigation.

All admissions are subject to the right of challenge for pertinency or materiality, and all questions of construction of ordinances and written instruments are open for argument and submission to the court.

The testimony developed as a fact that the most

crowded and congested condition at the station with which the Rothschild store is connected by the structure in question, occurs between the hours of seven and nine in the morning, and five to seven in the evening. That this station is one of most populous patronage on the "loop." From the evidence of the president of Rothschild & Company it develops that the passageway connects the second floor with the elevated station; that the store is open for business from 8:30 in the morning until six o'clock in the evening; that the general public has access to the passageway leading from the second floor of the building to the elevated road station and platforms during those hours; that at every entrance door is a notice, "Entrance to all Elevated Railroads;" that such fact is noted generally in newspaper advertising. It appears also upon all letter-heads, bill-heads, statement blanks and wrapping paper; that the passageway is used principally during shopping hours, and is most generously used between the hours of ten in the morning and four in the afternoon; that Rothschild & Company agreed with the elevated railroad that they would pay all the expenses of construction in connecting the passageway and bridge from the road to the building, and that they did so at a cost of between three thousand and thirty-five hundred dollars; that in the "waiting room" of the second floor, through which access is had to the bridge connection with the elevated station, there is merchandise, "ladies ready-to-wear garments" all around; that the room is in the same condition it has been ever since 1897; there are display cases on the west and north sides of the waiting room, also two or three six-foot cases; there are tables there, used to show garments; there is also a waiting room on the third floor immediately above this one, furnished practically in the same way. (R. pp. 394-5.)

Object in procuring the bridge was to offer better facilities for people to get in and out of the store; it was philanthropic and charitable as much as anything else. The notices over the doors and the printing on the stationery that the store is a means of entrance to the elevated railroads is for the purpose of procuring business; that was the primary purpose in all we have done in reference to the erection and maintenance of this bridge. (R. p. 392.) There is no ticket office in the building; it is out on the platform at the further extremity of the bridge. It is used for the sale of Metropolitan tickets only. "I use the outside stairways because I usually go home after the store is locked up and the entrance to the second floor is no longer available, and I have to use the outside stairway." (R. p. 426.) "We went into that bridge matter just exactly the same as we would if we were going to donate a thousand dollars to some charity. We carry on our store simply for the purpose of accommodating the public; incidentally we try to make a profit out of the business." (R. p. 430.)

The decree finds the equities with complainants and cross-complainant; that the bridge is a proper and legal structure and was constructed and is maintained under the ordinance of June 29, 1896; that the passageway was and is a necessary appliance and construction permitted by the ordinance above named for ingress and egress of the public to and from said elevated railroad structure to said Van Buren street.

*And the court further finds and adjudges, both from the evidence and the admissions of the complainant, Rothschild & Company, now in open court made, and by and with its consent, that the complainant, Rothschild & Company, has and does regard and consider and admit that the public have the right to and may use the passageways and aisles in said building now occupied by Rothschild & Company, including the elevators and stairways of said building now*

*occupied by Rothschild & Company, including the elevators and stairways of said building in going to and from the said platform and passageways connecting the said building of Rothschild & Company with the said elevated railroad structure, and that said Northwestern Elevated Railroad Company, its successors and assigns, by reason thereof, had and has the right to control the same for the use of its passengers.* (R. pp. 290-1.)

Plaintiffs in error are by this decree enjoined, during the time The Northwestern Elevated Railroad Company shall have the right to operate and does operate said elevated railroad, from interfering with the structure, and the ordinance of December 13, 1897, declaring the same a nuisance, is declared illegal and null and void so far as it operates to interfere with the maintenance of that structure.

The record is before this court for review on writ of error, and plaintiffs in error seek to have the decree reversed.

EDWIN WHITE MOORE, for plaintiffs in error; EDGAR BRONSON TOLMAN and JAMES HAMILTON LEWIS, of counsel.

CLARENCE A. KNIGHT, WILLIAM G. ADAMS, JUDAH, WILLARD & WOLF, and WILLIS E. THORNE, for defendants in error.

MR. JUSTICE HOLDOM delivered the opinion of the court.

Three questions lie at the root of the right to maintain this decree:

First, is the structure in question authorized by the ordinance of June 29, 1896, under the facts appearing in this record?

Second, is the ordinance of December 13, 1897, declaring this and like structures a nuisance, void as to the structure in question?

Third, is the structure built and maintained for the public convenience, or for private enterprise and profit?

First, as may be seen from the foregoing statement, the right to maintain this structure must be founded on the antecedent condition contained in the ordinance of June 29, 1896, that "nothing herein contained, however, shall prohibit said company from locating and maintaining its stations * * * in buildings adjacent to said stations or platforms, where authority is given by owners or lessees of said buildings for above purposes, wherein it may for the convenience and comfort of its patrons place *its* ticket offices, waiting rooms, sanitary accommodations, stairways, and all requisite methods of ingress and egress, and the right to construct and maintain covered passageways or connections between the *interior of all such station buildings* and the exterior platforms, is *hereby expressly granted to said company.*" It therefore becomes pertinent to ascertain whether or not the condition here provided did exist when this structure was erected. The purpose contemplated by this ordinance was the locating and maintaining in such buildings by the company of a station with a ticket office, not a station and ticket office of any particular or limited character, but a station and ticket office assumedly corresponding to other stations and ticket offices similarly situate, and sufficient to meet the necessities of patrons at such locations. It will be observed that there is nothing in this ordinance which allows a station ticket office of a different character to be installed and located within buildings adjacent to the elevated road from those maintained in the streets adjoining the platforms. Such stations, the ordinance contemplates, shall be supplied with waiting rooms, sanitary accommodations, stairways and all requisite methods of ingress and egress; in other words, shall have all

necessary adjuncts and accommodations usually found
at such stations. When stations are located in such
buildings by authority granted for that purpose, then
the elevated company under the ordinance is given
the right to construct and maintain passageways con-
necting the interior of "all such station buildings
and the exterior platforms" of the road. It is not
only undisputed but expressly admitted, that none of
the elevated roads using the loop, or the holding com-
pany, the Northwestern Elevated Railroad Company,
have any interest or control within the interior of the
Rothschild & Company building. In no sense does
the elevated company maintain any station in the
building connected with the "loop" by the structure
in question, and they have no control of the stair-
ways, the entrances or the exits. In no way is it
pretended that they have even a supervisory control
of the so-called waiting room at the north end of this
connecting passageway, nor is it contended that any
employe or servant of the roads are either in charge
of this waiting room or have anything whatever to do
with it. There is no ticket office maintained in this
so-called waiting room or in any other part of the
Rothschild building. This waiting room was main-
tained as such before the connecting passageway was
constructed. Rothschild & Company has complete
and absolute control of this room. In it they have
merchandise, counters, shelving and tables, and sales-
men to sell the goods. Immediately above it on the
third floor is a similar waiting room, and in other
parts of the building other rooms of a like charac-
ter. The nearest ticket office to this second floor
"waiting room" is at the south end of the connect-
ing passageway, where a ticket seller is maintained
at the expense of Rothschild & Company, who sells
tickets, during the hours the Rothschild establish-
ment is open for business, of the Metropolitan Com-
pany only. The structure itself was built at the cost

and expense of Rothschild & Company, who is bound to maintain it in good repair and to keep it clean and free from obstruction, as also the sidewalk and street underneath it and save harmless the elevated company from any damage resulting from any negligent maintenance of this structure. Every evidential fact in this record as to ownership of this connecting passageway would seem to indicate title in Rothschild & Company. They bargained for it. They paid for its construction. They have assumed every duty and obligation imposed by its maintenance, including responsibility for all damages which may flow from its maintenance. It is immaterial who in fact built this connecting passageway. If the elevated road did so, they did it for Rothschild & Company. In equity, forms must give way to substance; they will be brushed away in the search for the fact, and the disguise in which such fact may be clothed removed wherever found. By this method of procedure we find that the connecting structure was ostensibly built by the elevated railroad, not for themselves, but for Rothschild & Company, to whom, when completed, possession and control were delivered. Ordinarily stations are open to the public and tickets sold on all classes of railroads during the time trains are run. Not so with the ticket office on this connecting passageway, or the so-called waiting room in the Rothschild building. After Rothschild's business hours the so-called "waiting room," stairways leading to it, and the connecting passageway are closed, or, as put by a witness, "not available."

It is, however, contended that the contract made by Rothschild & Company for the construction of this connecting passageway was by the ordinance *supra* ratified and consequently must be given the same effect as though the city had in express terms authorized its construction and maintenance. While we are unable to coincide with this contention if it

were material to our decision, yet there being no proof that the existence of this contract was made known to the city or any of its officers, or that the city had in fact any knowledge of its existence, the ordinance in no way affects the rights of the parties under that contract, for the reason that this structure was not authorized by that ordinance. The ordinance does not contemplate the maintenance of any such structure by any one but the elevated railroad company in connection with a station. Ordinances of the nature of the one *supra* will be construed strictly in favor of the municipality and against those asserting rights under them. Such ordinances confer no powers not set forth in clear and explicit terms. Neither presumption nor implication will be indulged by construction, and in case of ambiguity nothing will be presumed in favor of the beneficiary. Snell v. City of Chicago, 133 Ill. 426; People v. L. & N. R. R. Co., 120 Ill. 48; Chicago Ter. R. R. Co. v. Chicago, 120 Ill. 576.

Second. In Pennsylvania v. City of Chicago, 181 Ill. 289, it was held that the city had no power or authority to grant the exclusive use of its streets to any private person or for any private purpose, but must hold and control possession exclusively for public use, laying down the rule that all public highways from side to side and end to end are held for the use of the public.

In Barnett v. Johnson, 15 N. J. Eq. 485, the court said: "The column of light and air above the road-bed, whether of land or water, is as much a part of the highway as the roadbed itself. * * * By its being declared a highway by the sovereign power, the light and air above it became again the common property of all, which all may breathe and use whenever they may legally touch it;" and again in Hibbard v. City of Chicago, 173 Ill. 91: "The right of the public to the exclusive use of the streets for public purposes

is inconsistent with the right of a private citizen to encroach thereon by the erection of a permanent structure. * * * The mere consent of the city council by resolution or order gives no vested right. The averment that the awning so erected does not injure or obstruct any person does not change the case. The sole question to be determined is, is it an encroachment on the street of the city, and, if so, it is a purpresture."

Elliott on Roads and Streets, p. 478, uses this language: "Any permanent structure or purpresture which materially encroaches upon a public street * * * is a nuisance *per se* and may be abated." In Snyder v. City of Mt. Pulaski, 176 Ill. 402, the court said: "A permanent encroachment upon public streets for a private use is a purpresture, and is in law a nuisance. * * * Such permission to so use the street is not binding on the city and is not irrevocable. The municipality having no power to grant such permanent use, there can be no estoppel against it from requiring the street to be open in its entirety, because no estoppel can arise from an act of the municipal authorities done without authority of law."

Notwithstanding the ordinance of July 29, 1896, and the permit issued by the commissioner of public works, authorizing the erection of this connecting passageway—even if the ordinance permitted its erection—in the circumstances here pointed out, the city had the right to declare it a nuisance and order its removal, and in so far as this connecting passageway is affected by the ordinance of December 13, 1897, such ordinance is a proper exercise of the authority of the city under the law and is legal.

Third. That this structure was built and is maintained for private gain to the business enterprise of Rothschild & Company is patent from all the evidential facts as detailed in the testimony of the witness Davis, the president of Rothschild & Company.

In the first place, they made the agreement with the elevated railroad company to permit of this connecting passageway a condition of their consent to the erection of the road in Van Buren street in front of their store. They agreed to pay all the expenses of its construction and maintenance, and to assume all the burdens arising from its maintenance in any way, and protect and save harmless the elevated company from any expense or liability incident to its construction and maintenance. It was primarily a feeder of patrons for their store, accessible and usable only during the hours the store is open and on the days open for business. At the hours the public is in the greatest need of its accommodations, it is closed. During the busiest and most congested condition of the station platforms and the stairways leading to it, it is useless. At no time when this structure does not serve as a feeder of patrons to the store of Rothschild & Company can it be used by the public. On Sundays and holidays, when it might serve as a relief to the crowded street entrances, exits and stairways, it is inaccessible. Davis says that the object of procuring the bridge was to offer better facilities for people to get in and out of the store, not the station—it was "philanthropic and charitable as much as anything else," he says, but with this we do not agree. The cross-complainant in answering the original bill denies in substance that the connection with the Rothschild building is of material assistance or necessary in accommodating the public or in relieving the stairways of travel in any appreciable way. It is plain that if the public must manage to get along without the stairways and connecting bridge at the hours of the greatest need, that they will suffer no hardship in being deprived of them at the less busy hours of the day. Without any doubt this structure is maintained for the benefit, accommodation and profit of Rothschild & Company not for the convenience of the public.

We place our decision in this case upon the facts and the law as we find them applicable to it, without any reference or bearing whatever to other cases referred to in argument and stipulation of facts, where it is claimed similar conditions exist and like questions arise as here. Such cases will be adjudicated when—if ever—they reach this court.

The decree of the Circuit Court is reversed, and the bill, supplemental bill and cross-bill are dismissed for want of equity, plaintiffs in error to recover cost in this and the Circuit Courts.

*Reversed.*